STATE, Plaintiff-Appellee, v. COPE, Defendant-Appellant.

Ohio Appeals, Second District, Montgomery County.

No. 1893. Decided April 30, 1946.

M. H. Heck, Prosecuting Attorney, M. J. Gilbert, Assistant Prosecuting Attorney, and Fred M. Kerr, Assistant Prosecuting Attorney, for Plaintiff-Appellee.

Kelly and Magsig, Dayton, for Defendant-Appellant.

**OPINION**

By WISEMAN, J.

This is an appeal on law from the Common Pleas Court of Montgomery County, Ohio. The defendant, Haskell Cope, was charged and found guilty of murder in the second degree for killing Jackie Ellen Bennett, fifteen years of age.

For his first assignment of error, defendant contends that the trial court erred in refusing to grant a continuance of the case after it developed from the voir dire examination of prospective jurors that two of said jurors admitted having read the Dayton newspapers which had carried articles stating that the court had refused to accept the defendant's plea of guilty to manslaughter and ordered him to stand trial. The record shows that this same matter was presented to the court on a motion for new trial which was overruled, and the court in its opinion found that twenty prospective jurors were selected before either side was called upon to exercise their peremptory challenges and that counsel for the defendant could have excused these two jurors if they saw fit, but did not avail themselves of this privilege. There is nothing in the record to show that these two jurors were prejudiced by anything which they may have read in the Dayton newspapers. They were properly qualified to sit as members of the jury. The failure of the trial court to grant a continuance did not constitute error.

For his second assignment of error the defendant contends that the trial court erred in refusing to make available to counsel for the defendant a copy of the typewritten statement signed by the defendant and given to Detective Pendell. The record shows that when Detective Pendell was on the witness stand he testified that several days prior to the trial he had examined this typewritten statement. However, he stated that he testified from his memory in regard to the oral statements made by the defendant immediately after the crime was committed. Later, he was asked the question as to whether he was not testifying from what he remembered from the defendant's oral statement and what was in the

written statement which he read a few days previously. In answer to this inquiry the witness testified, "I suppose." This written statement was not used by the witness to refresh his memory while on the witness stand. The witness testified that prior to the taking of the written statement the defendant had made an oral statement and that he later reduced to writing his oral statement and attempted to cover everything that the defendant had stated orally. The witness testified that the defendant stated he shot at the person in the room "with the purpose of intending to kill whoever it was; the form of whoever it might be." The written statement does not contain this admission on the part of the defendant. The record does not disclose whether the witness relied on his memory when he testified relative to what the defendant stated to him immediately after his arrest. The written statement was afterwards produced in court and introduced into the evidence. Ample opportunity was given to counsel for defendant to recall the witness and examine him in regard to the contents of the written statement. In view of the state of the record, we do not believe that the refusal of the court to require the State to produce the statement at the time Detective Pendell testified constituted error.

For his third assignment of error the defendant contends that the trial court erred in refusing to direct a verdict of "not guilty" at the close of all the testimony. This assignment of error will be considered in connection with assignments of error numbered ten and eleven.

For his fourth assignment of error the defendant contends that the trial court erred in failing to grant defendant's motion for mis-trial due to the absence of William Tally, one of the jurors, when the court, in the presence of the other eleven jurors, issued a bench warrant for his immediate arrest, when the absent juror had the opportunity to read the Dayton newspapers which carried a news item that the absent juror was subject to a fine up to $250 by reason of his failure to appear. For his fifth assignment of error the defendant contends that the trial court erred in failing to grant defendant's motion for a mis-trial due to the misconduct of William Tally, juror, in which he evidenced his total disregard of the responsibilities of a fair and impartial juror, which resulted in the court's later holding him for contempt of court. The record in this case shows that on Friday afternoon at the time the jury was excused, they

were instructed by the court to return at an early hour on Saturday morning for the purpose of hearing arguments of counsel and the submission of the case to the jury. On Saturday morning, one of the jurors, William Tally, failed to appear at the appointed hour. The court issued a bench warrant directed to the sheriff to find William Tally and bring him into court. The sheriff was unable to locate William Tally and so reported to the court. Thereupon, a discussion took place between counsel and the court as to whether the trial should proceed with eleven jurors. Because of the lateness of the hour, the court permitted the jurors to decide whether they wished to proceed on that day or return on Monday morning. The jurors having agreed to return on Monday morning, the court continued the matter until Monday. Over the week-end the Dayton newspapers carried a news item to the effect that because of his failure to appear, William Tally was subject to a fine up to $250. On Monday morning William Tally and the other jurors appeared and the case was argued and submitted to the jury. After the verdict of the jury was returned, the court excused all the members of the jury with the exception of William Tally. He was ordered to appear before the court in answer to a charge of contempt of court for his failure to appear on Saturday morning. He was examined by the court and not being able to purge himself of contempt of court, he was thereupon fined $100 and ordered committed to the County Jail until payment of the fine. There is nothing in the record to indicate that either William Tally or any other member of the jury read the newspaper accounts of this incident. The record does not show that William Tally or any other member of the jury was prejudiced against the defendant by reason of this unusual happening. Under all the circumstances, we are of the opinion that the trial court followed the proper procedure after William Tally failed to appear as a juror. Furthermore, by waiting until after the case had been submitted and the verdict returned, the trial court removed any possibility of prejudice on the part of William Tally or other members of the jury in their consideration of the case.

The seventh assignment of error has been withdrawn.

For his sixth, eighth, ninth and twelfth assignments of error, the defendant contends that the court erred in refusing to give three of the defendant's Special Instructions before argument, and failed to instruct the jury as requested by the defendant immediately after the court had finished his charge,

534

and that the court erred in charging the jury on second degree murder, the defendant contending that there was no evidence to support a charge of second degree murder. The defendant requested the court to give before argument Special Charge No. 2, which was refused, and which is as follows:

"If you find from the evidence that the defendant was aroused from his sleep and aroused to an honest impression there was a burglar in the room, and due to an inherent and subconscious fear that the night-season intruder was bent upon mischief either to the person or property of himself or to the other lawful occupants of the home, spontaneously, and proceeding from an unconscious internal impulse, shot at the form of what he believed to be a burglar, then the mistaken killing of Jackie Bennett would be excused in law and your verdict should be 'not guilty'."

We believe that this charge was properly refused as it did not require the jury to find that the defendant had reasonable grounds to believe, in protecting himself and the other occupants of the home and his property, he was in imminent danger of losing his life or suffering great bodily harm.

The third Special Charge submitted by the defendant, which was refused by the court, is as follows:

"I charge you as a matter of law that the mere presence of an unknown person at night in an unlighted room occupied by another is sufficient to justify the occupant to believe that the unknown person has entered his room with a felonious intent."

We know of no principle of criminal law in Ohio which would justify the court in giving this charge. It was properly refused.

The defendant requested before argument a Special Charge as follows:

"If you find that the facts and circumstances surrounding this fatal shooting can be reasonably reconciled with the theory of the defendant's innocence, your verdict should be 'not guilty'."

The substance of this Special Charge was covered in the court's general charge and for this reason we are of the opin-

ion that the court did not commit error in refusing to give this statement of law as a Special Charge before argument.

We are of the opinion that the court properly charged the jury with respect to second degree murder, as there is sufficient evidence in the case to justify the court in submitting the case on that issue. After the court had finished its general charge, the court inquired of counsel as follows:

"Do counsel for plaintiff and defendant desire any further charges?
"MR. GILBERT: No, your Honor."

Then follows this statement from Mr. Magsig, one of the attorneys for the defendant:

"The defendant excepts to the charge as given for the reason that nowhere did the court instruct the jury that in determining whether or not the defendant under all circumstances acted as a reasonable, ordinary, prudent man would act, nowhere did the court instruct the jury that they should take into consideration his background and education or lack of education, or any other mental deficiency that might have any effect whatever on his acting as a reasonable prudent man would be expected to act."

We assume that while counsel for defense first stated that he had no additional charges to offer, from the state of the record he did make a request for further instructions. From the statement of counsel, it is not very clear as to what test he wished the court to apply. It is clear, however, that the court was requested to instruct the jury that they should take into consideration the defendant's background, education, or lack of education, or any other mental deficiency that might have any effect whatever upon his "acting as a reasonable, prudent man would be expected to act." The test is not what a reasonable, ordinary, prudent man would do under the same or similar circumstances. The failure to give further instructions as requested by counsel for defendant, together with the court's general charge, in which he laid down an improper test, constituted error. In his general charge the court charged the jury as follows:

"The test of whether or not the defendant, Haskell Cope, had reasonable grounds to believe as he did, if you so find that he did, is: What would an ordinary, reasonable, prudent person do under the same or similar circumstances? In considering this you will take into consideration all the facts and circumstances surrounding this happening."

Where the defendant defends on the ground of self-defense or excusable homicide, the test to be applied is not what "an ordinary, prudent person" would have done under the same or similar circumstances, or whether the force used was that which a person of "ordinary firmness" would use to repel an assailant. The true test is whether the particular person on trial believed and had reasonable grounds to believe that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger would be by taking the life of his assailant although in fact he was mistaken as to the existence or imminence of the danger. Marts v State, 26 Oh St, 162; Napier v State, 90 Oh St 276, 278; State v Sheets, 115 Oh St 308, 309; Nelson v State, 42 Oh Ap 252.

In the case of Nelson v. State, supra, wherein the defendant plead self-defense, the Court of Appeals held that the trial court accurately defined self-defense by instructing the jury, "That the defendant could invoke that doctrine if in the careful and proper use of his faculties he bona fide believed and had reasonable grounds to believe, that the killing was necessary." However, in the general charge the court instructed the jury, "It must appear that the circumstances were sufficient to excite the fear of a reasonable person similarly situated, and that the defendant acted in good faith." This charge was held to be erroneous. Judge Mauck follows this observation by this statement:

"While the courts of this state have not always pursued an even course in defining the fear which one must entertain in order to rely upon self-defense, it seems now to be finally determined that guilt is personal, and that the conduct of any individual is to be measured by that individual's equipment mentally and physically. He may act in self-defense, not only when a reasonable person would so act but when one with the particular qualities that the individual himself has would so do. A nervous, timid, easily frightened individual is not measured by the same standard that a

stronger, calmer, and braver man might be. **State v Sheets, 115 Oh St 308, 152 N. E., 664.**"

Having found the charge of the court in the instant case to be erroneous, was it prejudicial?   **Sec. 13449-5 GC** provides that conviction shall not be reversed for "any misdirection of the jury unless the accused was or may have been prejudiced thereby." In the case of Napier v. State, supra, the court held that while the charge of the court was erroneous, it could not have prejudiced the rights of the defendant and therefore was not reversible error. In the case of **State v Witsel, 144 Oh St, 190,** it appears that the Court of Appeals found that the trial court committed serious error in the improper admission of evidence, and in its opinion held:

"We do not have the slightest difficulty in determining that the evidence was ample to support the conviction establishing the guilt of the defendant beyond a reasonable doubt and hence the first assignment of error that the verdict was against the manifest weight of the evidence is overruled * * *. Being convinced as we are, that the defendant was proven guilty, we hesitate to grant a new trial and we have sought in every way possible to find ways and means to obviate it."

The Supreme Court reversed the Court of Appeals, and in commenting on that portion of the opinion of the Court of Appeals above quoted, the court on age 193 say:

"Although this court is not required to pass upon the weight of the evidence presented by the record in this case, yet from a review of the evidence we are of the opinion that the Court of Appeals was justified in its observation as above quoted and that the jury had ample justification in rendering a verdict of guilty, entirely aside from the objectionable evidence which is now the subject of consideration."

"Under the circumstances shown by the record, this court cannot find affirmatively, as required by the statute, that the defendant was prejudiced by the error occurring at the trial and now complained of by him, in view of the caution and direction given to the jury by the trial judge concerning the evidence in question."

Even though the charge of the court was erroneous in the instant case, the question is still raised as to whether it was so prejudicial as to work a reversal. The court is required to consider all of the evidence in this case as well as the charge to the jury in its entirety in order to determine whether or not this defendant had a fair trial and whether there is ample evidence to justify the jury in finding the defendant guilty of murder in the second degree.

The record in this case shows that the defendant was thirty-eight years of age at the time the crime was committed; that he had been born and reared in the state of Tennessee. He left school while in the fifth grade and helped his father by working on a farm; at the age of nineteen he married and shortly thereafter was arrested for operating a motor vehicle without the owner's consent and was sentenced to serve a year and a day in the penitentiary. After being released from the institution and living a short time with his wife, they separated and were later divorced. In 1935, while living with his mother in Cookville, Tennessee, he met Mary Bennett, the mother of two daughters, Opal and Jackie Ellen, who lived with her. Her husband had been previously killed in an accident. The defendant and Mary Bennett never married but to them one child, Bobby, was born, who is now over eight years of age. Later the defendant came to Richmond, Indiana, where he was employed, and, upon learning that Mary Bennett had in the meantime moved to Dayton, the defendant left Richmond, Indiana, and came to live in Dayton with Mary Bennett. At the time the defendant first called on Mary Bennett in Dayton, she and her children were living in one room. Within two or three weeks they moved into a two-room apartment in the same building, at which time the defendant and Mary Bennett began to cohabit as husband and wife. This relationship continued for a period of two years, and in October 1944 they separated due to differences which had arisen between them. Within a few days after their separation the defendant was arrested and charged with possession of illegal gasoline stamps and was sentenced to a term in the Federal Reformatory at Ashland, Kentucky. During the time the defendant was in the Federal Reformatory, Mary Bennett moved back into a one-room apartment, where she continued to live with her daughter, Jackie, and her son, Bobby, her other daughter, Opal, having been married some time previous. On April 24, 1945, the defendant was released from the Ashland Reforma-

tory and immediately came to Dayton and found Mary Bennett living in this one-room apartment, which contained only one bed which was used by Mary Bennett and her daughter, Jackie, her son sleeping on a pad on the floor. In the evening of the day on which he returned, a discussion took place between the defendant, Mary Bennett and her daughter, Jackie, relative to their living arrangements. In order to permit the defendant immediately to begin his illicit relationship with Mary Bennett, Jackie was told she would be required to spend the night in the home of a girl friend, Betty Dean. The next day Mary Bennett did not go to her place of employment but spent the day with the defendant. In conversations which took place between the defendant and Mary Bennett it was generally agreed that the defendant should go to Richmond, Indiana, and there is some evidence which indicates that Mary Bennett planned to accompany him, and that Jackie and Bobby should live with an uncle until the end of the school term. Jackie was required to spend the second and third night with her girl friend. On the evening of the murder, the defendant and Mary Bennett discussed with Jackie their plan to have her live with her uncle. Betty Dean testified that on this evening when Jackie came to her home she observed that she had been crying, and upon being questioned, Jackie stated that she had been crying because she was expected to live with her uncle whom she disliked.

There is ample evidence from which the jury could conclude that on the third evening at the time Jackie left her home she stated to her mother that she might return later but if she didn't she would see her mother in the morning, and that this conversation took place in the presence of defendant. Mary Bennett testified that on that evening she asked her daughter Jackie whether she wished to eat, whereupon Jackie replied that when she came back she would probably eat something. The evidence shows that on each of the three evenings which the defendant spent in this one-room apartment, he and Mary Bennett occupied the bed, and Bobby slept on the floor, and that the defendant laid the pistol on the chair near the head of the bed on each evening; that on the third evening he cleaned the gun; that Jackie returned to the apartment with her friend, Betty, shortly after eleven o'clock for the purpose of getting a bottle of shampoo which was in the room; that she had a key to the door, unlocked it and went inside; that the one-room apartment was on the second floor; that Betty remained standing at the foot of the

stairs; that a short time after Jackie entered the room a shot was heard, whereupon Betty called several times for Jackie and upon getting no response went upstairs and knocked on the door; that after knocking several times the door was opened and Betty asked where Jackie was; that both Mary Bennett and the defendant told her that Jackie was on the inside and that she was alright. This incident is denied by the defendant, but is supported in part by Mary Bennett, who also testified that the defendant grabbed her and pulled her away from the door and sat her on the chair immediately in front of him and that when he turned to put his clothes on, she left the room. She further testified that the defendant stated that he wanted to get his clothes and gun, and get away. She testified that she persuaded him to stay; that she went to a lower room and called Mr. Mayberry; that the defendant still wanted to leave and that she and Mr. Mayberry both kept him from going; that the defendant said "They would kill him." The police were called and arrived at the scene within a few minutes, took the defendant into custody and removed Jackie to the hospital where she died as a result of a gunshot wound in the forehead.

The defendant claims that he was told by the children of Mary Bennett that while he was in the Federal Reformatory someone had broken in the apartment; that he laid the gun on the chair for protection; that on the night in question he was awakened by a thud which he described as a sound made by a heavy object falling on the floor; that he saw an object moving in the room and took the gun, pointed it at the object, and fired; that the firing of the shot awakened Mary Bennett; that the lights in the room were turned on and then he discovered that he had shot Jackie Bennett. The defendant claimed he placed the gun on the chair as a protection against an intruder but he admitted that it was always his custom to put a gun under the pillow. He stated that on the night in question that Mary Bennett placed the gun on the chair but finally admitted that he had placed the gun there. In his statement to the police he stated that it was the opening of the door that awoke him; that he fired the shot without making any move or outcry, and without making an investigation as to whether it was a man or woman or one of the occupants of the room; that he thought the person in the room was a burglar.

There is no evidence in this case except the statement of the defendant himself that this apartment had been pre-

viously burglarized. He denied stating to Mary Bennett that he was going to get out of there, and denied telling Betty Dean immediately after the shooting that Jackie was alright; denied that he was making an effort to get away when arrested, although the arresting officer testified that in his opinion he was attempting to make an escape. The defendant testified that he had purchased the gun from a pawn broker who took the stand and testified that he had never seen the defendant and had not sold the gun to the defendant.

On the question of identification, Mary Bennett testified that before the lights were turned on in the room she identified the person as her daughter, Jackie, by the buttons on her coat and by the dress she wore. Immediately after the arrest was made, the officers made a test of the room by turning out the lights. They testified that objects could be distinguished in the room, which was supported by the testimony of Mary Bennett who testified that objects in the room could be seen as well as things hanging on the wall.

A motive for the crime was not definitely proven, however it is not incumbent on the State to prove motive. The proof or lack of proof of the motive is a circumstance to be considered by the jury, together with all the other evidence in the case, in determining the guilt or innocence of the accused. However, there was evidence presented from which the jury could have reasonably concluded that the defendant had lived with several women in Dayton and another woman in Detroit who had a child by him. On the first evening after his return from the Federal Reformatory, Jackie was required to leave her room in order that the defendant might share the bed with her mother. The jury could reasonably conclude that his insistence to immediately renew illicit relations with Mary Bennett furnished a motive for killing Jackie, who on the third night disturbed him by returning to the bedroom. The court properly instructed the jury in regard to the proof or lack of proof of a motive.

The defendant contends that no difficulty arose between him and Jackie, and that their relationship had been entirely friendly. It is contended that since the defendant bore no ill will towards Jackie, therefore the State had failed to show malice. It is not incumbent upon the State under the peculiar circumstances in this case to prove that the defendant bore any ill will toward Jackie. The defendant is charged with second degree murder, the elements of which are a

██ purposeful and malicious killing of another. When the defendant is charged with murder in the second degree, malice may be presumed from a purposeful and unlawful killing with a deadly weapon. Did the defendant purposely kill the person he found in the room? If he intended to kill the person he found in the room, and there is evidence in this case from which the jury could conclude that he did, even though he was mistaken as to that person's identity, the doctrine of transferred intent would apply, and the defendant in this case would be charged with the intentional and purposeful killing of Jackie Bennett. The purpose to kill is proved by circumstances; by what a party does and says, the manner of inflicting the wounds, the instrument used, and its tendency to destroy life. When the defendant awoke and found some person in the room, took the gun, aimed at a vital spot, and fired, under the circumstances in this case and in the light of the testimony with reference to the ability to identify the person and objects in the room, the jury was justified in finding that the defendant intentionally and purposely killed the person in the room.

Was the commission of the act justified or excusable? Before the jury was justified in finding the defendant was justified or excused in committing the act, it would be required to find that the defendant honestly believed, and also had reasonable grounds to believe that he was in imminent danger of death or great bodily harm, and that his only means of escape from such danger would be by taking the life of the person he found in the room, although in fact he was mistaken as to the existence or imminence of the danger. After considering the evidence as to the manner in which the crime was committed, and all the surrounding circumstances, the cleaning of the gun by the defendant on the evening of the murder; his evasiveness as to whether he or Mary Bennett placed the gun on the chair on the night in question; his knowledge that Jackie might return later that night; the evidence that objects in the room could be identified; that Jackie was identified before the lights were turned on; that Jackie was a girl fifteen years of age; the evidence in this case as to his desire to flee the scene of the crime; we are of the opinion that the jury on this issue was amply justified in finding that the defendant did not have reasonable ground to believe that he was in imminent danger of death or great bodily harm. Once the jury had arrived at this place in the consideration of the case, it was required to

find that the defendant had not sustained his claim that the homicide was justifiable or excusable. Any intentional killing without a legal justification or excuse, and not within the realm of voluntary manslaughter, would be a malicious killing. Where a wrongful killing has been proved, a presumption is raised that simple malice is present and, consequently, that the crime is murder in the second degree. 21 O. Jur. p 60. This court is of the opinion that there was ample evidence to support the verdict of the jury that the defendant was guilty of murder in the second degree.

Reverting to the question as to whether or not the charge as given misled the jury, all the evidence relative to the type and character of the defendant as an individual, his education, experience, general background, and his general powers of comprehension as reflected in his testimony, must be considered, and after giving careful consideration to all the evidence in regard thereto, we are of the opinion that he differed only slightly, if at all, as an individual from the ordinary person, and that consequently the jury was not misled by the charge as given.

The improper test as applied by the trial court was based on the assumption that the defendant was awake and rational. However, the defendant's principal defense was that he fired the shot before he was sufficiently awake to appreciate the effect of his act. The Court fully covered this situation by giving a Special Charge requested by the defendant, which was definitely favorable to the defendant, the substance of which was that the defendant's act would be excusable in law and he should be acquitted, if the Jury found that the defendant was aroused to an honest impression that there was a burglar in the room and that the defendant, on the spur of the moment, shot at the form of what he believed to be a burglar before he was sufficiently awake to properly appraise the situation confronting him. The jury rejected this theory of defendants case.

After considering the charge in its entirety and the fact that the court in substance did charge the jury in two separate findings to the effect that the defendant should be acquitted if the jury found that he honestly believed, and had reasonable ground to believe, he was in imminent danger of death or great bodily harm, we do not believe, and therefore cannot say, that the jury may have given a different verdict had the proper test been applied. On the whole, we are of

544

the opinion that the defendant had a fair trial, and that the charge of the court, while it was erroneous, was not of such import as to mislead the jury, and consequently any error which may appear was not prejudicial to the defendant.

For his third, tenth and eleventh assignments of error the defendant contends that the trial court erred in refusing to direct a verdict of "not guilty" at the close of all the testimony; that the verdict was against the manifest weight of the evidence and contrary to law. In view of the evidence in this case, we are of the opinion that the court properly overruled the motion for a directed verdict, and that the verdict is amply supported by the evidence. We have already commented on the law applicable to the issues in this case and find that the verdict and judgment of the court was not contrary to law and that the court did not commit prejudicial error.

Judgment will be affirmed.

HORNBECK, PJ, and MILLER, J, concur.

## ON APPLICATION FOR REHEARING

No. 1893.   Decided May 17, 1946.

## OPINION

By THE COURT:

Application for rehearing by Defendant-Appellant.

This Court in its original opinion found that the trial court committed error in its charge to the jury, but that the error was not prejudicial because the Court was convinced of the guilt of the defendant and that there was ample evidence to support the verdict of the jury. Under the rule laid down in the case of **State v Witsel, 144 Oh St 190,** this Court is of the opinion that the error committed is not reversible error.

The applicationn for rehearig will be denied.

HORNBECK, PJ, WISEMAN and MILLER, JJ., concur.