[Cite as *State v. Patterson*, 2025-Ohio-280.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 22AP-436 |
| v. | : | (C.P.C. No. 20CR-2054) |
| Clifford L. Patterson, Jr., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on January 30, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** *Mitchell A. Williams*, Public Defender, and *Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Clifford L. Patterson, Jr., appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, following a jury trial, finding him guilty of two counts of murder with firearm specifications. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} On May 14, 2020, appellant was indicted on one count of aggravated murder in violation of R.C. 2903.01, an unspecified felony; one count of purposeful murder in violation of R.C. 2903.02(A), an unspecified felony; and one count of felony murder in violation of R.C. 2903.02(B), an unspecified felony. Each count carried a three-year

firearm specification pursuant to R.C. 2941.145(A).  The charges arose from the shooting death of Dion S. Lamarr on May 10, 2020.

{¶ 3}  A jury trial commenced on April 18, 2022.  Plaintiff-appellee, State of Ohio, presented the following evidence.

{¶ 4}  Lakihila Bell testified that on May 10, 2020, she lived with her children and her boyfriend, Lamarr, in a two-story apartment located on Fountain Lane in Whitehall. That morning, Bell woke to someone "banging" on the front door of the apartment. (Tr. Vol. 2 at 186.) As she descended the stairs, she could hear Lamarr arguing with appellant, the next-door neighbor; the two apartments shared a common wall.  Appellant was standing on the porch complaining about loud banging noises and music coming from the apartment.  The argument eventually became heated, with appellant ultimately telling Lamarr he "[w]anted to beat his ass."  (Tr. Vol. 2 at 268.)  Lamarr responded, "[w]ell, we can fight if you want."  (Tr. Vol. 2 at 268.)  After this exchange, appellant stepped off the porch onto the sidewalk and Lamarr stepped onto the porch; both continued to argue.

{¶ 5}  Shortly thereafter, Lamarr went back inside the apartment to retrieve his shoes.  Bell told Lamarr he "doesn't need to fight" and that fighting "wasn't worth it." (Tr. Vol. 2 at 269.)  Lamarr responded that he was tired of appellant "disrespecting" them. (Tr. Vol. 2 at 269.)  Bell described Lamarr's demeanor as "calm" but "irritable."  (Tr. Vol. 2 at 270.)  Lamarr walked out the front door; Bell followed him.  At that point, appellant was not outside; Bell told Lamarr that appellant "[o]bviously * * * don't want to fight" and to "just leave it alone," and urged him to come back into the apartment.  (Tr. Vol. 2 at 270.) Lamarr, unarmed, walked out to the sidewalk in front of the apartment.  Seconds later, appellant exited his apartment and renewed the argument with Lamarr.  According to Bell, appellant was "being really belligerent" and taunted Lamarr about fighting.  (Tr. Vol. 2 at 272.) Bell warned Lamarr that appellant had a gun in his hand.  When Lamarr saw the gun, he put his hands up and told appellant, "You know, it's not worth it.  We supposed to fight. You got a gun."  (Tr. Vol. 2 at 278.)  Bell pushed Lamarr back toward the apartment. Appellant, still arguing, fired one shot toward Lamarr and Bell.  Lamarr pushed Bell to the side; she then fell to the ground.  Lamarr "stutter-stepp[ed] backwards" between two cars parked in the adjacent parking lot.  (Tr. Vol. 2 at 279.)  When Bell stood up, she saw Lamarr fall to the ground.  Appellant was standing over Lamarr, "sucker punching" him and calling

him derogatory names. (Tr. Vol. 2 at 280.) Bell jumped on top of Lamarr because appellant was still aiming his gun at him. Appellant then went back inside his apartment while Bell tended to Lamarr. When police arrived at the scene, Bell reported that appellant had shot Lamarr. Shortly thereafter, police informed Bell that Lamarr had passed away.

{¶ 6} On cross-examination, Bell testified that approximately ten minutes after the incident, she provided a recorded statement to police. According to Bell, her trial testimony largely echoed that statement, with some minor differences. As an example, in her statement to police, Bell said that Lamarr "stormed down the steps" after putting on his shoes and heading toward appellant's apartment. (Tr. Vol. 2 at 294.) Bell further testified that only two-to-three minutes elapsed between the time she and Lamarr exited their apartment and appellant walked back to his apartment after shooting Lamarr. Bell admitted she was recently convicted of fourth-degree felony drug trafficking and was sentenced to one year non-reporting probation stemming from an incident in August 2020.

{¶ 7} Kayla Ford testified that on May 10, 2020, she lived in an apartment on Irongate Lane, which is situated across the parking lot from the apartment complex located on Fountain Lane. On that date, as she left her apartment she heard a "commotion." (Tr. Vol. 2 at 310.) She saw two men facing each other; they were not physically fighting. She could not see how far apart the men were from each other. Moments later, she saw a "gun go up," heard shots fired, and saw a man "stumble[] back." (Tr. Vol. 2 at 311.) She did not see a weapon in the hands of the man who had fallen. She immediately returned to her apartment and remained inside for a brief period. She eventually looked outside and saw a man on the ground and a "hysterical" woman near him. (Tr. Vol. 2 at 315.) She testified that she had never before seen the shooter and had seen the victim only occasionally. She further testified she did not observe any aggressive behavior from the victim prior to the shooting; she did not see him raise his arms or charge the shooter; rather, he was just "standing there." (Tr. Vol. 2 at 316.) After police arrived, the shooter surrendered.

{¶ 8} On cross-examination, Ford testified she did not see either man run after the other and did not see the shooter punch the victim or fire any additional shots at him while the victim was on the ground. She further testified that after the incident, she twice spoke to police and provided a written statement. In both interviews, she reported the men were facing one another prior to the shots being fired.

{¶ 9} Whitehall Division of Police ("WPD") Detective John Dickey testified that he and his partner, Detective Anthony McKittrick, were performing a "patrol-type function" at approximately 9:24 a.m. on May 10, 2020 when they were dispatched to the scene of a shooting in the Fountain Lane area. (Tr. Vol. 2 at 201.) Upon arrival, the detectives observed the victim of the shooting, later identified as Lamarr, dead on the ground in a parking lot adjacent to an apartment building located on Fountain Lane. A woman, later identified as Lamarr's girlfriend, Bell, was leaning over Lamarr's body; she was "very distraught." (Tr. Vol. 2 at 206.) Bell told the detectives that a neighbor, later identified as appellant, had shot Lamarr; she directed the detectives to appellant's apartment. Immediately thereafter, appellant was found in his apartment; he surrendered without incident. Pursuant to a search warrant, a semiautomatic handgun, a holster, and ammunition were recovered from appellant's apartment. Detective Dickey testified that four spent shell casings were collected from the parking lot near Lamarr's body. The handgun, shell casings, and bullets recovered from Lamarr's body during the autopsy were submitted to the Ohio Bureau of Criminal Investigation for testing.

{¶ 10} Detective Dickey further testified that appellant was transported to the WPD station for an interview. The 18-minute video-recorded interview was conducted by Detectives Dickey and McKittrick. Without objection from the defense, the state played the video for the jury.[1]

{¶ 11} During the interview, appellant stated he lived next door to Lamarr in the same apartment building. For the past year, he had heard Lamarr threatening and taunting him through their shared wall. Appellant tried to ignore Lamarr's threats because he was afraid of him, as he was a big, vicious, intimidating guy. Appellant conceded, however, that Lamarr had never directly threatened to kill him.

{¶ 12} On the morning of the shooting, he heard loud noises emanating from Lamarr's apartment; he went to the apartment, unarmed, and asked Lamarr if he could keep the noise at a minimum. Lamarr responded that he was "about two seconds off his ass." (Tr. Vol. 3 at 402.) Appellant went back to his apartment and retrieved his gun, which he placed in a holster at the side of his body. Appellant went outside and saw Lamarr

---

[1] The video of appellant's interview is part of the record on appeal. (State's Ex. K.) The audio portion of the interview was not transcribed.

standing near his (appellant's) porch.  Lamarr challenged appellant to a fight. Appellant was scared and told Lamarr to leave him alone.  Lamarr lunged at him, but the two never physically fought.  Appellant was aware that Lamarr did not have a gun.  Appellant showed Lamarr his gun; Lamarr, apparently surprised by the gun, took a step backward in retreat. However, fearing that Lamarr was going to attack him physically, and believing that Lamarr was too big for appellant to fight and that he needed to protect himself, appellant just "gave it to him," which meant that he pulled the trigger.  (Tr. Vol. 3 at 437.)  Appellant estimated he shot Lamarr two or three times.  Appellant averred he did not mean to hurt Lamarr; rather, he just wanted Lamarr to "back off."  (Tr. Vol. 3 at 424.)  Thereafter, Lamarr collapsed in the street in front of the apartment building.  Appellant apologized to Lamarr and told him he just had to defend himself.

{¶ 13} Appellant stated that he "knew this day would come" eventually, because he was tired of being bullied by Lamarr. (Appellant's Brief at 16.) Appellant averred that he "stood his ground," and theorized that had he not shot Lamarr, Lamarr might have taken his gun and used it on him.  (Appellant's Brief at 20.)  When the detectives reported that Lamarr had passed away, appellant was visibly upset, averred he did not mean to kill Lamarr, and that he should have just let Lamarr beat him up.

{¶ 14} Detective Dickey further testified that after the interview, he and Detective McKittrick collected gunshot residue samples and a DNA standard from appellant.  Because appellant admitted he shot Lamarr, neither were submitted for laboratory testing.

{¶ 15} On cross-examination, Detective Dickey averred that when appellant surrendered to police, he did not exhibit any angry or threatening behavior and made no attempt to flee or hide his gun; instead, he surrendered without incident and placed his gun on the kitchen table.  Detective Dickey acknowledged that shooting suspects often attempt to hide evidence or flee the scene in an effort to avoid apprehension.  Detective Dickey further asserted that appellant willingly cooperated during the interview process; he did not threaten the detectives nor did he appear to be angry.  Instead, he appeared to be remorseful and was visibly upset when informed that Lamarr had succumbed to the injuries inflicted by the gunshots.  Indeed, appellant apologized and stated  "I should have just let [Lamarr] beat my ass."  (Tr. Vol. 2 at 231.)  Detective Dickey further acknowledged that

during the interview, appellant claimed he shot Lamarr in self-defense and stated no less than 25 times that he did so because he was afraid for his life.

{¶ 16} WPD Officer John Buerkel testified that on May 10, 2020, he was dispatched to an address on Fountain Lane on a "shots-fired call." (Tr. Vol. 2 at 237.) A witness at the scene directed Officer Buerkel to a nearby apartment. Appellant exited the apartment; Officer Buerkel ordered him to the ground and placed him in handcuffs. Appellant fully cooperated during this process. Officer Buerkel then entered appellant's apartment and observed a handgun sitting on the kitchen table.

{¶ 17} On cross-examination, Officer Buerkel acknowledged that when appellant exited his apartment, he was unarmed, cooperative, and non-combative. He further acknowledged that pursuant to his training and experience as a police officer, determination as to whether to use his weapon requires assessment of the threat level posed by a particular person through observation of that person's demeanor, attitude, use of threatening language, combativeness, physical aggression, proximity, and whether the person is armed or unarmed. As to the proximity prong of the assessment, Officer Buerkel acknowledged the so-called "21-foot rule" or "Tueller rule," which stems from the theory that a person approaching a police officer can cover 21 feet before the officer can unholster and fire their weapon. (Tr. Vol. 2 at 249.) He further acknowledged that a potentially dangerous individual who is within 21 feet poses a physical threat, including punching, kicking, or wresting away a weapon, which elicits the need to protect oneself. He also surmised that when an individual takes a gun from another person, he or she is likely to use it against that person. Officer Buerkel further testified that an Ohio citizen who lawfully obtains a CCW license may use the firearm for personal protection when necessary.

{¶ 18} John A. Daniels, M.D., testified that he was working as a forensic pathologist for the Franklin County Coroner's Office on May 11, 2020. On that date, he performed an autopsy on Lamarr and prepared a report of his findings. Dr. Daniels testified to the contents of his report. The report indicates that Lamarr, an African-American male, was 37 years old, 6'4" tall, weighed 274 pounds, and had "some degree" of marijuana in his system at the time of his death. (Tr. Vol. 3 at 344.) The report further states that Lamarr was shot four times—once in the left upper back, once in the left mid back, once in the left upper chest, and once in the abdomen. Dr. Daniels described the trajectory of the shots to

the left upper back and left mid back as "very similar," traveling from "back to front, from left to right, and from above downward," indicating that "the muzzle of the firearm was behind the individual." (Tr. Vol. 3 at 356; 352.) As to the shot to the upper left chest, the trajectory of the bullet was "left to right, slightly from front to back, and from above downward." (Tr. Vol. 3 at 361.) Based on the downward trajectory of the bullet, Dr. Daniels concluded that "this individual was probably bent over, bending over from back to front, when he was shot." (Tr. Vol. 3 at 362.) As to the shot to the abdomen, the trajectory of the bullet was "left to right, from front to back, and slightly from above down." (Tr. Vol. 3 at 364-65.)

{¶ 19} Dr. Daniels' testified that his report refers to each of the four gunshot wounds as "an indeterminate range entrance gunshot wound," which Dr. Daniels explained as "the muzzle-to-target distance" could not be determined. (Tr. Vol. 3 at 346, 349.) The report further indicates that the order in which the gunshots were fired could not be determined. Pursuant to the autopsy, Dr. Daniels recovered four bullets from Lamarr's body. Dr. Daniels testified that the three gunshots to the back and chest were separately lethal. He further testified he found no evidence that Lamarr had been physically assaulted after he was shot. On cross-examination, Dr. Daniels essentially reiterated the testimony he provided on direct examination, including his conclusion that Lamarr was bent over when he was shot in the upper left chest.

{¶ 20} The state also entered into the record two joint stipulations. The first provided that if called to testify, BCI Special Agent Rachel Phelps would testify that she assisted WPD in processing the crime scene, which entailed taking photographs, collecting evidence, preparing an investigative report, evidence log, and scene sketch and that the parties stipulated to the admission of those documents. The second provided that if called to testify, BCI Forensic Scientist Matthew White would opine that on examination, the spent shell casings and spent bullets were all fired from the weapon recovered from the scene, and that his findings to that effect were set forth in a laboratory report.

{¶ 21} After the state rested its case, appellant testified as the sole witness in the defense case. According to appellant, he and his mother lived in an apartment next to Lamarr, Bell, and Bell's two children on Fountain Lane. Appellant described Lamarr as "big," "hardcore," "rough," and "seemed like a person from the streets"; in short, he did not

get a "good vibe" from Lamarr. (Tr. Vol. 3 at 387-88.) Appellant often heard Lamarr's voice, which appellant described as "loud and aggressive," through their shared wall. (Tr. Vol. 3 at 387.) Recognizing that such circumstances "just came with the territory of living next to somebody with a wall," appellant was not "enrage[d]" by the situation. (Tr. Vol. 3 at 389.)

{¶ 22} Appellant testified that prior to the incident at issue, he had no problems with Lamarr or Bell; indeed, he had only "regular neighborly conversations" with them. (Tr. Vol. 3 at 384.) Appellant acknowledged he had some interactions with Lamarr related to parking issues, which required him to ask Lamarr to move his car. However, appellant was not angry, upset, or afraid when he had to do so, and Lamarr responded peacefully to appellant's requests. Approximately two weeks prior to the incident, Lamarr told appellant he respected him and his mother because they were "quiet," "hardworking," "good" people. (Tr. Vol. 3 at 395.) During this same conversation, Lamarr apologized for his family's sometimes loud behavior and encouraged appellant to discuss the situation with him when necessary. This conversation altered appellant's view of Lamarr; in fact, he thought Lamarr might be a "decent dude." (Tr. Vol. 3 at 395.)

{¶ 23} On May 10, 2020, appellant heard "banging" and "thumping" noises coming from Lamarr's apartment. (Tr. Vol. 3 at 399.) Appellant walked to Lamarr's apartment and "knocked politely" on the front door. (Tr. Vol. 3 at 399.) When the door "[flew] open," appellant could tell Lamarr was irritated, angry, or upset about something. (Tr. Vol. 3 at 399.) Although appellant was startled by Lamarr's behavior, he did not think Lamarr was angry at him. Appellant asked Lamarr to keep the noise down; Lamarr responded "Look, don't come over here with that bullshit." (Tr. Vol. 3 at 401.) When appellant reminded Lamarr of their recent conversation where he was encouraged to report noise issues, Lamarr responded, "Look, I'm about two seconds off your ass." (Tr. Vol. 3 at 402.) Appellant interpreted this statement to mean that Lamarr was "probably about to kick my ass or tackle me." (Tr. Vol. 3 at 402.) Given Lamarr's size, appellant did not want to fight him. Appellant walked back to his apartment; he heard Lamarr cursing and screaming to Bell about him. Appellant recounted the incident to his mother and told her he was going to leave the apartment for the day. Before leaving, he retrieved his keys, wallet, phone, and gun. According to appellant, he obtained a concealed-carry license six years prior to the

incident; for safety reasons, he routinely carries it with him.  Prior to the incident, he never had occasion to use his gun, and he did not take it with him to shoot Lamarr.

{¶ 24} When appellant left his apartment, he saw Lamarr leaning against his (appellant's) car.  Appellant turned his back to Lamarr to lock the door; Lamarr stood up and told appellant "don't come over here with that bullshit," and "don't even walk past my doorway anymore." (Tr. Vol. 3 at 411-12.)  Lamarr also told appellant, "don't even take a step off of that porch or I'm going to beat your ass." (Tr. Vol. 3 at 413.)  Lamarr had "his fists balled" when he spoke to appellant. (Tr. Vol. 3 at 413.)  At this point, appellant was scared of Lamarr.  Appellant did not verbally respond to Lamarr's statements; instead, he stepped off his porch and walked toward his car.  Lamarr then stepped toward appellant with his fists clenched.  Appellant both told and showed Lamarr that he had a gun; however, he did not threaten to shoot Lamarr.  When Lamarr saw the gun, he became angry and charged at appellant with his fists still clenched.  Appellant took a step back and drew his gun.  When Lamarr continued to charge at him, appellant was concerned that Lamarr was coming after him and/or his gun.  Feeling "trapped," "terrified," "fear[ing] for my life," and convinced that Lamarr was going to kill him or "cause me bodily harm or, at the very least, do what he said * * * and kick my ass," appellant fired his gun at Lamarr. (Tr. Vol. 3 at  418, 425.)  Appellant observed Lamarr fall to the ground; he ran to Lamarr, apologized, and asked him if he was alright; he did not strike him in the face.  When Lamarr did not respond, he went back to his apartment and told his mother to call the police.  He placed his gun on the kitchen counter and waited for the police.  When police arrived, he complied with their command to get on the floor; he told them multiple times that he was "scared" and "just protecting myself" when he shot Lamarr. (Tr. Vol. 3 at 422.)

{¶ 25} Police handcuffed appellant, placed him in a cruiser, and transported him to the police station, where he was interviewed by two detectives.  During the interview, he was "in shock" and "disoriented" and could barely think straight.  (Tr. Vol. 3 at 422.) Appellant told the detectives he shot Lamarr because he was "aggressive," "big" and "was in my face." (Tr. Vol. 3 at 424.)  Appellant further stated that he was "afraid," "scared," felt "cornered" and "trapped," and only wanted to "eliminate the threat." (Tr. Vol. 3 at 424, 432.)  He shot Lamarr only because he felt like he had no other option.  Appellant testified

that he feels "horrible" about the incident and remains "devastated" and "traumatized" by it. (Tr. Vol. 3 at 424.)

{¶ 26} On cross-examination, appellant asserted that when Lamarr charged at him after being warned not to do so, he believed Lamarr was going to try to kill him. He conceded that he did not express this belief during his interview with police; instead, he told police he should have let Lamarr "kick my ass." (Tr. Vol. 3 at 427.) Appellant testified he "feared for [his] life," was "very scared," "very afraid," and "petrified" at the time of the incident because Lamarr was a "very big person," was "very aggressive," and was "very intimidating." (Tr. Vol. 3 at 427.) Appellant denied that he was just trying to "defend [his] actions" when he spoke to the police and provided testimony at trial; rather, he was just "telling the truth and telling * * * what happened." (Tr. Vol. 3 at 428.)

{¶ 27} The prosecutor questioned appellant about inconsistences in the statements he made to police and those he provided during his direct testimony. For instance, the prosecutor pointed out that appellant told police he was tired of Lamarr's bullying and that he "knew this day was going to come," but at trial he averred he was not afraid of Lamarr until he approached him on the day of the incident with his fists clenched. (Tr. Vol. 3 at 429.) Appellant conceded that the statements he made to police could be interpreted to mean that "things [were not] good" between the two men prior to the incident. (Tr. Vol. 3 at 430.) However, he explained that "[t]hings that come out * * * aren't always the way they're meant, though," and that he was "still disoriented" and "in shock" at the time of his police interview. (Tr. Vol. 3 at 430-31.) The prosecutor also noted that appellant did not tell police that Lamarr had given him permission to come to his apartment and discuss concerns about noise issues. Appellant attributed this failure to the fact that he "might not have gotten every detail exactly correct after that just happened." (Tr. Vol. 3 at 432.) The prosecutor also pointed out that appellant never asked police about Lamarr's condition or expressed any concern about him. Appellant conceded that he did not express his concern about Lamarr and made a mistake in not doing so; he attributed his mistake to the fact that "a million things were going through my mind," he was "disoriented," "still in shock," and "traumatized" because the incident had "just happened." (Tr. Vol. 3 at 433-34.) When questioned about his failure to tell police that Lamarr's fists were clenched when he lunged at appellant, appellant replied, "I'm sorry if I didn't get every single detail right." (Tr. Vol.

3 at 437.) When asked about telling police that when Lamarr saw the gun in appellant's hand, "[h]e started to retreat, and then I just gave it to him," and not telling police that appellant charged at him when he saw the gun, he stated he may have mistakenly used the word "retreat" with police and was "disoriented," "wasn't thinking straight" and was "trying to tell the story the best I could" at the time he was interviewed.  (Tr. Vol. 3 at 437-38.) Appellant vehemently denied the prosecutor's suggestion that because he was now aware of the law related to self-defense, he fashioned his trial testimony to conform thereto.

{¶ 28} Appellant further testified he did not mean to kill Lamarr when he shot him four times; rather, he was attempting to "stop him from coming toward me, * * * to eliminate him * * * from threatening me with bodily harm." (Tr. Vol. 3 at 435.) Appellant estimated that Lamarr was "close" to him," "less than 2 feet" away when he shot him. (Tr. Vol. 3 at 435.) Appellant testified that Lamarr never touched him because "I didn't give him a chance to." (Tr. Vol. 3 at 436.)  Appellant asserted "[t]here's no doubt in my mind, by the time I pulled that gun and he was coming toward me, charging at me, that he was going to kill me and cause me bodily harm." (Tr. Vol. 3 at 436.)  Appellant denied that he killed Lamarr because he was angry about the noise problem.

{¶ 29} Following the presentation of evidence and the parties closing arguments, the trial court provided the jury with instructions on the law of self-defense, having previously concluded that sufficient evidence had been presented tending to support that appellant used deadly force in self-defense.  Defense counsel objected to the extent that the jury instructions on self-defense included language regarding the use of "unreasonable force." (Tr. Vol. 4 at 470.)

{¶ 30} Following deliberations, the jury returned verdicts finding appellant not guilty of aggravated murder but guilty of both purposeful and felony murder and the accompanying firearm specifications.  At the May 27, 2022 sentencing hearing, the trial court merged the two murder counts and the state elected sentencing on the felony murder count and its firearm specification.  The court sentenced appellant to 15 years to life plus a mandatory consecutive 36-month term for the firearm specification. Appellant's convictions and sentence were memorialized in the trial court's May 27, 2022 judgment entry.

{¶ 31} Appellant did not file a timely notice of appeal to this court from the trial court's May 27, 2022 judgment. However, this court granted appellant's App.R. 5(A) motion for leave to file a delayed appeal upon concluding that appellant had provided a reasonable explanation for his failure to perfect a timely appeal. *State v. Patterson*, 10th Dist. No. 22AP-436 (Nov. 3, 2022) (memorandum decision).

## II. Assignments of Error

{¶ 32} Appellant appeals and assigns the following two assignments of error for our review:

> [I.] The jury's verdict of guilt ran against the manifest weight of the evidence because the prosecution failed to demonstrate Appellant was not acting in self-defense at the time he shot Dion Lamarr.
>
> [II.] The lower court erred when, either over the timely objection of the defense or pursuant to plain error principles, it instructed the jury the prosecution may carry its burden of demonstrating Appellant did not act in self-defense if it proved beyond a reasonable doubt he exercised unreasonable force while doing [so]. The court's instruction violated Appellant's right to a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution, Article III, Section 2 of the United States Constitution, Article I, Sections 5, 10, and 16 of the Ohio Constitution, R.C. 2901.05(B)(1), R.C. 2901.09(B), R.C. 2945.11, Crim. R. 30(A) and Crim. R. 52(B).

## III. Analysis

{¶ 33} In his first assignment of error, appellant argues that his convictions for purposeful and felony murder with firearm specifications are against the manifest weight of the evidence. More particularly, appellant contends the state failed to prove beyond a reasonable doubt that he was not acting in self-defense when he fatally shot Lamarr.

{¶ 34} " 'Weight of the evidence' " concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other. *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, quoting *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). When presented with a manifest weight challenge, an appellate court sits as a " 'thirteenth juror' and may disagree 'with the factfinder's resolution of the conflicting

testimony.' " *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 16, quoting *State Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). In making this determination, an appellate court " 'review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175. Further, reversal of a jury verdict on manifest weight grounds requires unanimous concurrence of all three judges on the court of appeals panel reviewing the case. *Harris* at ¶ 18, citing Article IV, Section 3(B)(3) of the Ohio Constitution; *State v. Short*, 10th Dist. No. 22AP-543, 2024-Ohio-92, ¶ 13, citing *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

{¶ 35} Appellant was convicted of purposeful murder pursuant to R.C. 2903.02(A), which provides that: "[n]o person shall purposely cause the death of another." Appellant was also convicted of felony murder pursuant to R.C. 2903.02(B), which provides in part that "[n]o person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Here, the predicate offense underlying the felony murder charge is felonious assault.

{¶ 36} Appellant does not dispute he shot Lamarr with a firearm and that the gunshots caused Lamarr's death. Instead, appellant argues that events preceding the shooting established that he fatally shot Lamarr in self-defense. Appellant maintains that because the state failed to prove that he did not act in self-defense, the jury lost its way in so concluding.

{¶ 37} Historically, self-defense has been an affirmative defense, requiring an accused to prove the elements of self-defense by a preponderance of the evidence. *State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 25. However, effective March 28, 2019, the General Assembly amended R.C. 2901.05, Ohio's self-defense statute. R.C. 2901.05(B)(1) now provides in relevant part: "[a] person is allowed to act in self-

defense * * *.  If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * * as the case may be."

{¶ 38}  Thus, pursuant to R.C. 2901.05(B)(1), an accused no longer bears the burden of establishing the elements of self-defense by a preponderance of the evidence.  *Ferrell* at ¶ 26.  Instead, when an accused presents evidence that tends to support that the accused used force against another in self-defense, the state must disprove at least one of the elements of self-defense beyond a reasonable doubt.  *State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31.  "The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal." *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 27.

{¶ 39}  The elements of a self-defense claim differ depending on whether the accused employed deadly or non-deadly force to defend against their perceived assailant.  *State v. Stevenson*, 10th Dist. No. 17AP-512, 2018-Ohio-5140, ¶ 33.  In the present case, there is no doubt that appellant employed deadly force, as he shot Lamarr with a handgun.  *See State v. Marshall*, 61 Ohio App.2d 84, 86 (10th Dist.1978) ("A gun may inflict death * * * in the manner for which it was designed by firing a bullet."); *see also State v. Dale*, 2d Dist. No. 2012 CA 20, 2013-Ohio-2229, ¶ 15 ("The use of a gun constitutes the use of deadly force."); R.C. 2901.01(A)(2) (defining "[d]eadly force" as "any force that carries a substantial risk that it will proximately result in the death of any person").

{¶ 40}  When deadly force is used, the state must disprove beyond a reasonable doubt at least one of the following elements of a self-defense claim: (1) the accused was not at fault in creating the situation giving rise to the affray; (2) the accused had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force, and (3) the accused did not violate any duty to retreat or avoid the danger.  *Messenger* at ¶ 14, citing *State v. Barnes,* 94 Ohio St.3d 21, 24 (2002).  To state it in the affirmative, when deadly force is used, the state must prove beyond a reasonable doubt that the accused " ' "(1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in

imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." ' " (Emphasis sic.)  *State v. Jamii*, 10th Dist. No. 21AP-330, 2023-Ohio-4671, ¶ 77, quoting *State v. Messenger*, 10th Dist. No. 19AP-879, 2021-Ohio-2044, ¶ 36, quoting *Carney* at ¶ 31.

{¶ 41} Regarding the first element of a self-defense claim, the notion that an accused must not be at fault in creating the situation " 'is broader than simply not being the immediate aggressor.' "  *State v. Bender*, 3d Dist. No. 14-23-12, 2024-Ohio-1750, ¶ 27, quoting *State v. Elam*, 12th Dist. No. CA2021-08-106, 2022-Ohio-1895, ¶ 14.  " 'A person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense.' "  *Id.*, quoting *Elam* at ¶ 14.  "[A] multitude of courts have found that a defendant is at fault in creating the situation giving rise to the affray * * * when he chooses to confront the victim, chooses to knowingly go to a place where the victim will be or refuses to move in a direction away from the victim, even when the defendant's action was otherwise completely lawful."  *State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 15.

{¶ 42} The second element of a self-defense claim employs "a combined subjective and objective test."  *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997).  The trier of fact "first must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, []he *reasonably* believed []he was in imminent danger." (Emphasis sic.)  *Id.*  "Then, if the objective standard is met, the [trier of fact] must determine if, subjectively, this particular defendant had an *honest* belief that []he was in imminent danger." (Emphasis sic.) *Id.* at 331.

{¶ 43} Implicit in the second element of self-defense is the requirement that " 'the defendant must have used only that force reasonably necessary to repel the attack.  That is, he must not have used excessive force.' "  *Jamii* at ¶ 77, quoting *State v. Hall*, 10th Dist. No. 21AP-137, 2023-Ohio-837, ¶ 41, citing *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58.   The defendant's use of deadly force must be "warranted under the circumstances" and "proportionate" to the perceived threat.  *Kean* at ¶ 58, quoting *State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 31.  "Thus, ' "[i]f * * * the amount of force used is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable." ' "  *Id.*, quoting *State v. Bundy*, 4th Dist. No.

11CA818, 2012-Ohio-3934, ¶ 55, quoting *State v. Macklin*, 8th Dist. No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman*, 4th Dist. No. 00CA035 (Mar. 27, 2001).

{¶ 44} As to the third element of a self-defense claim, i.e., the "duty to retreat" requirement, we note that effective April 6, 2021, the General Assembly amended R.C. 2901.09 as to that element. R.C. 2901.09(B) provides in relevant part: "For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(C) further provides that "[a] trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense * * * reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety."[2]

{¶ 45} Before addressing appellant's specific arguments pertaining to his self-defense claim, we note that " ' "[a] self-defense claim is generally an issue of credibility." ' " *Jamii* at ¶ 78, quoting *State v. Lawrence*, 11th Dist. No. 2022-L-110, 2023-Ohio-3419, ¶ 41, quoting *State v. Olsen*, 11th Dist. No. 2022-A-0071, 2023-Ohio-2254, ¶ 57. " ' "Disputes in credibility for the purpose of evaluating self-defense are best resolved by the trier of fact." ' " *Id.*, quoting *Lawrence* at ¶ 41, quoting *State v. Bentley*, 11th Dist. No. 2022-L-076, 2023-Ohio-1792, ¶ 24. " ' "It has been held that 'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version' and rejected the defendant's claim of self-defense." ' " *Id.*, quoting

---

[2] The effect of the 2021 amendments to R.C. 2901.09, which is now widely referred to as the "stand your ground" law, is to expand the "no duty to retreat" exception from the person's residence or vehicle to any place where the person is lawfully entitled to be. *State v. Estelle*, 3d Dist. No. 1-20-50, 2021-Ohio-2636, ¶ 21, fn. 5. Here, the offense occurred on May 10, 2020 and the jury trial commenced on April 18, 2022. As already noted, the amendments to R.C. 2901.09 were effective April 6, 2021. Thus, the statute was amended after the offense was committed but prior to the commencement of trial. This court has previously stated that there is no language in R.C. 2901.09 indicating that the General Assembly intended the amendments to apply retroactively to conduct occurring before the effective date of the statute. *State v. Khalif,* 10th Dist. No. 23AP-274, 2024-Ohio-2239, ¶ 53, citing *State v. Huish*, 10th Dist. No. 21AP-255, 2023-Ohio-365, ¶ 63, fn. 8, citing *State v. Parker*, 1st Dist. No. C-210440, 2022-Ohio-3831. We also noted in *Khalif* that the Supreme Court of Ohio has not yet issued a ruling as to whether the amendments to R.C. 2901.09 apply retroactively. *Id.* at ¶ 53. We note that the Supreme Court has accepted *Khalif* for review. *State v. Khalif*, S.Ct. No. 2024-Ohio-0930; *appeal accepted* 2024-Ohio-2239. Although the Supreme Court has not yet ruled in *Khalif*, it recently ruled in *State v. Miree*, 2024-Ohio-5714, that the amendments to R.C. 2901.09 are not retroactive. Nevertheless, in the present case, despite the fact that the offense occurred in 2020, prior to the amendments to R.C. 2901.09, the trial court, following discussion about the retroactivity issue with the parties, provided jury instructions consistent with the self-defense law as it existed in April 2022, which included a "no duty to retreat" instruction.

*Lawrence* ¶ 41, quoting *Bentley* at ¶ 24, quoting *Messenger*, 2021-Ohio-2044, at ¶ 49. " 'When weighing witness testimony supporting a claim of self-defense, the trier of fact is "free to believe or disbelieve the testimony of the witnesses" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." ' " *Id.*, quoting *Lawrence* at ¶ 41, quoting *Bentley* at ¶ 24, citing *State v. Haney*, 11th Dist. No. 2012-L-098, 2013-Ohio-2823, ¶ 43.

{¶ 46} Appellant first contends the state did not prove he was at fault in creating the situation giving rise to his use of deadly force against Lamarr. Citing his own testimony, appellant avers that when he went to Lamarr's apartment to discuss the noise issue, he was courteous and polite; however, Lamarr responded in an aggressive, angry, and threatening manner, telling appellant "don't come over here with that bullshit," and "I'm about 2 seconds off your ass." (Appellant's Brief at 37.) When he later exited his apartment, Lamarr escalated matters when he stopped leaning on appellant's car, stood up, and with clenched fists, told appellant "don't come over here with that bullshit," to not walk past Lamarr's apartment in the future, and threatened to "beat his ass." (Appellant's Brief at 38.) Appellant told Lamarr to leave him alone multiple times. Lamarr ignored his warning that he had a firearm and instead charged at him with clenched fists. Appellant maintains that "[i]t is apparent [he] was not the initial aggressor, nor did he escalate the situation to deadly force, nor did he provoke Dion Lamarr into using force." (Appellant's Brief at 39.)

{¶ 47} Appellant also discounts the testimony offered by Bell. As noted above, Bell testified that during the initial encounter between appellant and Lamarr, a verbal argument ensued, resulting in appellant telling Lamarr he "wanted to beat his ass." (Tr. Vol. 2 at 268.) Bell also testified that during the second encounter between appellant and Lamarr, appellant renewed the argument with Lamarr, was "being really belligerent" and taunted Lamar about fighting. (Tr. Vol. 2 at 272.) Bell also testified that after Lamarr saw appellant had a gun, he told appellant "it's not worth it. We supposed to fight. You got a gun." (Tr. Vol. 2 at 278.) Appellant argues that Bell's version of the events was questionable in light of her prior felony conviction for drug trafficking; appellant also contends Bell is not an objective witness given her romantic relationship with Lamarr. Appellant also argues that Bell corroborated his testimony that Lamarr wanted to fight him. Specifically, appellant notes

Bell's testimony that Lamarr was "irritated" during the initial encounter with appellant, "stormed down the steps" when he walked toward appellant's apartment and did not heed her advice not to fight appellant. (Tr. Vol. 4 at 485.)

{¶ 48} The state counters it proved appellant was at fault via Bell's testimony that during the initial counter between appellant and Lamarr, appellant told Lamarr he "wanted to beat his ass," and that appellant continued to taunt Lamarr about fighting during their second encounter. (Tr. Vol. 2 at 268.) The state also argues that Ford corroborated Bell's testimony that there was a verbal altercation between appellant and Lamarr prior to the shooting. The state maintains that based on this evidence, the jury could have found that appellant provoked the fight and was thus at fault in creating the confrontation leading to Lamarr's death. We further note that appellant told the police that he was tired of being bullied by Lamarr and that he "knew this day would come" eventually.

{¶ 49} Given the conflicting testimony as to who initiated and/or reinitiated the confrontation between appellant and Lamarr, the jury, as the trier of fact in this case, was best positioned to make determinations about credibility and weight of the testimony. *Jamii* at ¶ 78. As to both encounters, the jury could have credited Bell's testimony and discounted the testimony provided by appellant. Further, the jury could have ascribed credence to appellant's assertion to police that he was tired of being bullied by Lamarr. Based on the state's evidence, the jury could have reasonably concluded that appellant was at least partially at fault for creating the situation giving rise to the shooting of Lamarr.

{¶ 50} Moreover, even if we were to agree with appellant that the state did not prove he was at fault in creating the situation giving rise to the shooting of Lamarr, the state proved appellant did not possess the necessary objective and subjective beliefs that he was in imminent or immediate danger of death or great bodily harm and that the only means of escape from the danger was in the use of deadly force. Appellant relies on his own testimony that Lamarr threatened him during both their initial and subsequent encounters. Specifically, appellant argues that during the second encounter, Lamarr moved toward him in a "menacing fashion," threatening to "kick [appellant's] ass" if he stepped off his porch. (Appellant's Brief at 45.) Appellant also notes that Lamarr continued to approach him with clenched fists after repeatedly being told to leave him alone. Appellant further notes that Lamarr, apparently enraged by appellant showing him he had a gun, continued to charge

at him with clenched fists. Appellant maintains these actions led him to believe Lamarr would seriously injure or kill him. Appellant contends his evaluation of the danger posed to him by Lamarr's actions was consistent with the factors Officer Buerkel discussed during his testimony in the context of a law enforcement officer evaluating the danger imposed by a would-be assailant, including the assailant's use of threatening language, his demeanor, attitude, combativeness, physical movements, and proximity and whether the assailant is armed. Appellant further maintains that his behavior following the shooting, i.e., surrendering without resistance and cooperating with police, underscores that his actions against Lamarr were reasonable and infers that he had done nothing wrong by defending himself against Lamarr. Appellant further argues that his use of deadly force against Lamarr was reasonably necessary to repel his attack. Specifically, appellant maintains that when Lamarr charged at him "with clenched fists, rage, and threats [his] response of discharging the firearm at him was not unreasonable." (Appellant's Brief at 51.)

{¶ 51} The state responds that appellant's use of deadly force was unreasonable, unwarranted, excessive, and not proportionate to the perceived threat. In support of its argument, the state cites appellant's statement to police that he shot Lamarr because he thought Lamarr was going to beat him up and he wanted to eliminate that threat. The state also asserts appellant's claim at trial that Lamarr stepped toward him with clenched fists was refuted by Bell and Ford. The state specifically notes Ford's testimony that she observed Lamarr facing appellant, "just standing there," when appellant pointed the gun at Lamarr and that Lamarr made no aggressive moves toward appellant prior to the shooting; indeed, she did not see Lamarr raise his arms or charge appellant. (Tr. Vol. 2 at 316.) The state also notes Bell's testimony that after Lamarr realized appellant had a firearm, he raised his hands and said, "it's not worth it." (Tr. Vol. 2 at 278.) The state also maintains that appellant's statement to police after the shooting confirmed that Lamarr never moved aggressively toward appellant. The state specifically notes appellant's statement that when he brandished his firearm, Lamarr began to retreat; appellant then "just gave it to him," firing multiple shots. (State's Ex. K.)

{¶ 52} While appellant is free to cite his own testimony in arguing that he was justified in using deadly force because he was fearful based on Lamarr's verbal threats and his lunging at him, the jury, as the trier of fact, reasonably could have rejected appellant's

version of the events. Whether appellant shot Lamarr because he feared Lamarr would attack him and/or wrestle appellant's gun from him and shoot him with it were questions for the jury to consider. The jury was free to believe or disbelieve any or all of the testimony appellant provided on these issues. *State v. Kurtz,* 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 31, citing *State v. Jackson*, 10th Dist. No. 06AP-1267, 2008-Ohio-1277, ¶ 11. In this regard, "[t]he trier of fact is in the best position to take into account the inconsistencies in the evidence, as well as the demeanor and manner of the witnesses, and to determine which witnesses are more credible." *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10. The jury observed the testimony of appellant and the state's witnesses, all of whom were subject to cross-examination. The jury also reviewed appellant's videotaped interview with police. It was within the province of the jury to conclude that appellant, by reason of Lamarr's actions, did not possess the necessary objective and subjective beliefs that he was in imminent or immediate danger of death or great bodily harm. Consequently, the weight of the evidence presented reflects that appellant used deadly force when he was not faced with deadly force and the degree of force used by appellant was neither warranted under the circumstances nor proportionate to the perceived threat posed by Lamarr. *See Kean* at ¶ 68.

{¶ 53} Having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of witnesses, we conclude the jury did not lose its way and create a manifest miscarriage of justice when it found the state proved beyond a reasonable doubt that appellant did not act in self-defense when he fatally shot Lamarr.

{¶ 54} The first assignment of error is overruled.

{¶ 55} In his second assignment of error, appellant contends the trial court erred in instructing the jury that the state may carry its burden of demonstrating he did not act in self-defense by proving beyond a reasonable doubt that he exercised unreasonable force while doing so. In support, appellant argues (1) the instruction was not legally correct

because it is an extra requirement and not one of the three elements of self-defense; and (2) the instruction was not factually-warranted.[3]

{¶ 56} The trial court provided the jury with the following oral and written instructions regarding self-defense:

### SELF-DEFENSE

The defendant is allowed to use deadly force in self-defense. The State must prove beyond a reasonable doubt that the defendant, when using deadly force, did not act in self-defense.

To prove that the defendant, when using deadly force, did not act in self-defense, the State must prove beyond a reasonable doubt at least on of the following:

1. The defendant was at fault in creating the situation giving rise to the death of Dion Lamarr; or

2. The defendant did not have reasonable grounds to believe that he was in imminent or immediate danger of death or great bodily harm;

3. The defendant did not have an honest belief, even if mistaken, that he was in imminent or immediate danger or death or great bodily harm; or

4. The defendant used unreasonable force.

(Jury Instructions at 7-8.)

---

[3] The dissent makes several arguments regarding Ohio's self-defense law. To begin, consistent with what the appellant has argued on appeal, the dissent opines the unreasonable force instruction is an extra requirement notwithstanding the precedent from this court and other courts and its inclusion in OJI. *See* Dissent at ¶ 89-96. The dissent then continues by addressing arguments appellant did not raise in his briefing or before the trial court. First, the dissent opines that even if the unreasonable force instruction is implicit in the second element of self-defense, the instruction was legally insufficient because it did not convey that reasonableness of force is a subjective consideration, grounded in a defendant's bona fide belief. *See* Dissent at ¶ 97-115. The dissent suggests that when giving an unreasonable force instruction, a court must instruct a jury "[to] put yourself in the position of the defendant, with his characteristics, his knowledge or lack of knowledge, and under the circumstances and condition that surrounded him at the time." Dissent at ¶ 113. Second, the dissent opines "even disregarding the improper 'unreasonable force' instruction, I believe the jury was still inaccurately instructed on the second element of self-defense, to the prejudice of Mr. Patterson [because it is not possible or prudent to splice components of the second element as the trial court did in this case]." Dissent at ¶ 118. Because appellant did not raise these latter two arguments on appeal, we will not address the same.

{¶ 57} Appellant challenges the portion of the trial court's self-defense instruction that states: "The defendant used unreasonable force." (Jury Inst. at 8.) At the outset, we note that appellant objected on the record to the "unreasonable force" language in the jury instruction. (Tr. Vol. 4 at 460.) In addition, appellant submitted his own proposed jury instructions. Appellant's proposed instruction on self-defense essentially tracks the language set forth in the trial court's instructions, with the only difference being excision of the "unreasonable force" language.

{¶ 58} In his merit brief, appellant argues, and the dissent agrees, that the trial court's "unreasonable force" instruction was "not legally correct," as it "added an extra requirement to the right of self-defense under Ohio law that is not warranted." (Appellant's Brief at 54.) Appellant devoted very few pages of his merit brief and no pages of his reply brief to this argument and did not develop this argument nor cite to authority to support the same.[4] We disagree with appellant and the dissent as the Supreme Court of Ohio, our

---

[4] Notwithstanding appellant's argument before this court now, in objecting to the unreasonable force instruction before the trial court, appellant argued that the "unreasonable force" instruction should not be included in the jury instructions because:

> [the unreasonable force instruction] has [not] been adapted to the purpose of stand-your-ground [law]. * * * And so I think adding whether or not the jury feels that using that firearm in a manner of deadly force is then also unreasonable adds another layer that was not intended in the stand-your-ground language and the purpose of stand-your-ground***that really goes against the legislative intent of the law in the way that it's enacted. I just think it's very confusing for the jury, and we're taking them down this path of the law that states you have to look at his belief whether it was reasonable or unreasonable under the circumstances, but now we're adding and we're telling them, but he has a right to use deadly force because of stand-your-ground; but then we're adding this but was that force unreasonable also? And I just think that the purpose of the stand-your-ground language is to allow for deadly force, point blank, and using that unreasonable force test from prior self-defense instructions adds a level of confusion that I think was not intended.

(Tr. Vol. 4 at 461-62.)

As noted in footnote 2, *supra*, the "stand-your-ground" law to which appellant refers was enacted in 2021. 2020 Am. S.B. No. 175, effective April 6, 2021 ("S.B. 175"). The General Assembly amended R.C. 2901.09 to expand the "no duty to retreat" exception from the person's residence or vehicle to any place "in which the person lawfully has a right to be." R.C. 2901.09 now states:

> (B) For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be.

own court, and other Ohio courts have held that the requirement to not use unreasonable force is implicit in the second element of self-defense.

{¶ 59} In *Messenger*, 2022-Ohio-4562, the Supreme Court of Ohio set forth the following:

> A self-defense claim includes the following elements:
>
> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Messenger*, 2022-Ohio-4562, at ¶ 14, quoting *Barnes* at 24.

{¶ 60} With the General Assembly having amended R.C. 2901.05 to shift the burden from the defendant to the state to prove beyond a reasonable doubt that the defendant did not act in self-defense, this court has described the state's burden as one of "disproving" the elements of self-defense. *See State v. Lee*, 10th Dist. No. 23AP-543, 2024-Ohio-4498, ¶ 15, finding "the state must disprove at least one of the * * * elements of a self-defense claim." This court has also described the state's burden as one of "proving" that the defendant "(1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." (Emphasis sic.) (Internal quotations deleted.) *State v. Cumberlander*, 10th Dist. No. 23AP-90, 2024-Ohio-2431, ¶ 43, quoting *Jamii* at ¶ 77, quoting *Messenger*, 2021-Ohio-2044, ¶ 36, quoting *Carney* at ¶ 31.

---

(C) A trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense, defense of another, or defense of that person's residence reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety.

We are not persuaded by appellant's argument to the trial court as it relates to the "stand-your-ground" law. The "stand-your-ground" law limits the third element of self-defense, i.e., the duty to retreat, whereas the "unreasonable force" instruction is one component of the second element of self-defense, i.e., that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force.

{¶ 61} Whether described as a burden of disproving or proving, the second element—regarding a bona fide belief that defendant was in imminent danger of death or great bodily harm for which the use of deadly force was his [or her] only means of escape—was articulated in terms of a subjective and objective analysis by the Supreme Court of Ohio as far back as 1875 in *Marts v. State*, 26 Ohio St. 162 (1875), which stated: "Homicide is justifiable on the ground of self-defense, where the slayer, in the careful and proper use of his faculties, [1] bona fide believes, and [2] has reasonable ground to believe, that he is in imminent danger of death or great bodily harm, and that his only means of escape from such danger will be by taking the life of his assailant, although in fact he is mistaken as to the existence or imminence of the danger." (Emphasis omitted.) *Marts* at 167. In *State v. Sheets*, 115 Ohio St. 308 (1926), the Supreme Court of Ohio held that self-defense "is placed on the grounds of the [1] bona fides of defendant's belief, and [2] reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties." *Sheets* at 310. In *McGaw v. State*, 123 Ohio St. 196 (1931), the Supreme Court held "a person indicted for maliciously shooting with intent to kill or intent to wound may defend on the ground of self-defense, and may testify that [1] in good faith he believed, and [2] had good grounds on which to so believe, that he was in great and immediate danger of serious personal injury or death, and that his only escape therefrom was to shoot his assailant." *McGaw* at paragraph one of the syllabus. The Supreme Court has expressly observed that "the second element of self-defense is a combined subjective and objective test." *Thomas*, 77 Ohio St.3d at 330. *See also Cumberlander* at ¶ 45. *Compare State v. Koss*, 49 Ohio St.3d 213, 215 (1990) (stating "Ohio has adopted a subjective test in determining whether a particular defendant properly acted in self-defense. The defendant's state of mind is crucial to this defense").

{¶ 62} Furthermore, in addition to describing the second element as a combined subjective and objective test, the Supreme Court in *State v. Williford*, 49 Ohio St.3d 247 (1990), reiterated the three prongs of self-defense as stated in *Messenger*, 2022-Ohio-4562, and added that "[t]he defendant is privileged to use that force which is reasonably necessary to repel the attack." *Williford* at 249, citing *State v. McLeod*, 82 Ohio App. 155, 157 (9th Dist.1948). In *State v. Gray*, 2d Dist. No. 26473, 2016-Ohio-5869, the Second District Court of Appeals noted that "often missing from quotations of the self-defense formulation

is the requirement that the force used be reasonable. A person is only privileged to use that force which is reasonably necessary to repel the attack." *Gray* at ¶ 8. The court explained:

> Another component contained within the second element is the defendant's bona fide belief that the use of force was "reasonably necessary to repel the attack." [*State v. Hendrickson,* 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 23], citing *State v. Williford,* 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990), citing *State v. McLeod,* 82 Ohio App. 155, 157, 50 Ohio Law Abs. 475, 80 N.E.2d 699 (9th Dist.1948). In other words, a defendant must show that "that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *Hendrickson* at ¶ 31, citing *State v. Palmer,* 80 Ohio St.3d 543, 564, 1997 Ohio 312, 687 N.E.2d 685 (1997). "If * * * the amount of force used is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable." *State v. Macklin,* 8th Dist. Cuyahoga No. 94482, 2011-Ohio-87, 2011 WL 208315, ¶ 27, quoting *State v. Speakman,* 4th Dist. Pickaway No. 00CA035, 2001-Ohio-2437 (Mar. 27, 2001). Accord *State v. Kimmell,* 3rd Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 20, quoting *Hendrickson* at ¶ 33 ("Self-defense * * * is inappropriate if the force used is 'so grossly disproportionate as to show revenge or as criminal purpose.' "). "[I]t is only when one uses a greater degree of force than is necessary under all the circumstances that it is not justifiable on the ground of self-defense." *McLeod,* 82 Ohio App. at 157.

*Id.*, quoting *State v. Waller*, 4th Dist. No. 15CA3683, 2016-Ohio-3077, ¶ 26.

{¶ 63} Similarly, this court has tied the "unreasonable force" instruction to the second element of self-defense as outlined in *Messenger*, 2022-Ohio-4562. In *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, we held:

> As set forth above, the second element of self-defense requires a defendant show he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. [*State v.*] *Goff,* [128 Ohio St.3d 169, 2010-Ohio-6317] at ¶ 36. One component of the second element "entails a showing that the defendant used 'only that force that is reasonably necessary to repel the attack.' " *State v. Bundy,* 4th Dist. No. 11CA818, 2012-Ohio-3934, ¶ 55, 974 N.E.2d 139. *See also* [*State v.*] *Montgomery,* [12th Dist. No. CA 2015-03-028, 2015-Ohio-4652] at ¶ 16, quoting *State v. Ray,* 12th Dist. No. CA2012-10-213, 2013-Ohio-3671, ¶ 30, 997 N.E.2d 205 ("The second element of self-

defense involves determining whether the defendant's use of force was 'reasonably necessary to repel the attack' or in other words, whether the defendant used excessive force."). Implicit in the "second element of self-defense, i.e., that the defendant's use of deadly force was in 'good faith,' is the requirement that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *State v. Hendrickson,* 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 31. Thus, " '[i]f * * * the amount of force used is so disproportionate that it shows an "unreasonable purpose to injure," the defense of self-defense is unavailable.' " *Bundy* at ¶ 55, quoting *State v. Macklin,* 8th Dist. No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman,* 4th Dist. No. 00CA035, 2001-Ohio-2437 (Mar. 27, 2001). Under Ohio law, "[t]his rule applies even if a defendant is attacked in his residence or vehicle," as "[a] defendant who is attacked in his or her residence or vehicle does not possess a license to kill." *Id.* at ¶ 56. Rather, "the defendant may only use deadly force if necessary to prevent death or great bodily injury." *Id.,* citing *State v. Thomas,* 77 Ohio St.3d 323, 327, 1997-Ohio-269, 673 N.E.2d 1339 (1997).

*Kean* at ¶ 58.

**{¶ 64}** We reiterated the same in *State v. Hall*, 10th Dist. No. 21AP-137, 2023-Ohio-837, stating:

The second prong of a self-defense claim presents the issue of whether the defendant had an honest belief that he was in imminent danger of death or great bodily harm and that the use of deadly force was the only means of escape. Under this prong, the defendant must have used only that force reasonably necessary to repel the attack. That is, he must not have used excessive force. *State v. Kean,* 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58. Again, Hall's testimony indicated that Peterson threatened to kill Hall during a physical altercation, Peterson struck Hall on the head with a glass vodka bottle, and then he retrieved a gun and began to raise that gun at Hall. Hall testified that he responded by rapidly firing all the bullets in his semi-automatic pistol. The testimony of Hall's brother, Marcus, also indicated that, after their second fight, Peterson told Hall that he could have killed him with a bottle and his gun, then he struck Hall with the glass vodka bottle and retrieved a gun from the kitchen. During an interview with police on the night of the shooting, however, Marcus had stated that he was not sure whether Peterson had a gun. Although Marcus was in

> the apartment at the time of the shooting, he testified that he did not see the shots fired.

*Hall* at ¶ 41.

**{¶ 65}** We recently reiterated the same in *Cumberlander:*

> One component of the second element entails a showing that " 'the defendant must have used only that force reasonably necessary to repel the attack. That is, he must not have used excessive force.' " [S*tate v.*] *Jamii*, [10th Dist. No. 21AP-330, 2023-Ohio-4671] at ¶ 77, quoting *State v. Hall,* 10th Dist. No. 21AP-137, 2023-Ohio-837, ¶ 41, citing *State v. Kean,* 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58. Further, "[i]mplicit in the 'second element of self-defense, i.e., that the defendant's use of deadly force was in "good faith," is the requirement that the degree of force used was "warranted" under the circumstances and "proportionate" to the perceived threat.' " *Kean* at ¶ 58, quoting *State v. Hendrickson,* 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 31. "Thus, ' "[i]f * * * the amount of force used is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable." ' " *Id.* at ¶ 58, quoting *State v. Bundy,* 4th Dist. No. 11CA818, 2012-Ohio-3934, ¶ 55, 974 N.E.2d 139, quoting *State v. Macklin,* 8th Dist. No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman,* 4th Dist. No. 00CA035, 2001-Ohio-2437 (Mar. 27, 2001).

*Cumberlander* at ¶ 46.

**{¶ 66}** More specifically, this court has tied the "unreasonable force" instruction to the "only means of escape" component of the second element of self-defense.  In *Carney,* we held that "[c]onsistent with the self-defense requirement that force must be the only means of escape, a person may only use as much force as is reasonably necessary to repel the attack." *Carney*  at ¶ 30, citing *State v. Howard*, 10th Dist. No. 16AP-226, 2017-Ohio-8742, ¶ 22, citing *State v. Jones*, 10th Dist. No. 14AP-496, 2015-Ohio-2357, ¶ 27; *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 25; *Williford* at 250; *Thomas* at 329-30. *See also State v. Hodgson*, 11th Dist. No. 2021-L-022, 2021-Ohio-4374, ¶ 91, citing *Thomas* at 326.

**{¶ 67}** In addition to the Ohio case law set forth above, we also note the trial court's instruction on self-defense, including the instruction on unreasonable force, is consistent with the instructions set forth in 2 Ohio Jury Instructions, Section CR 421.21(1).  We

recognize that the Ohio Jury Instructions are not binding legal authority; however, this court has attached significance to a trial court's instructions that are consistent with the language from the Ohio Jury Instructions. *State v. Aekins*, 10th Dist. No. 21AP-630, 2023-Ohio-322, ¶ 118, citing *Ellis*, 2012-Ohio-3586, at ¶ 12.

{¶ 68} With all of this in mind, we conclude the trial court's unreasonable force instruction was legally correct, as unreasonable force is a component implicit in the second element of self-defense; therefore, the unreasonable force instruction was not an extra requirement as appellant argues.

{¶ 69} At oral argument, appellant conceded that under appropriate circumstances, an "unreasonable force" instruction might be legally accurate. Indeed, appellant acknowledged case law from this court and others finding that implicit in the second element of self-defense is the requirement that a defendant may use only the force necessary to repel an attack and that a defendant's use of deadly force must be warranted under the circumstances and proportionate to the perceived threat. *Jamii* at ¶ 77; *Hall* at ¶ 41; *Kean* at ¶ 38; *Hendrickson* at ¶ 31.

{¶ 70} However, appellant maintains that under the particular facts and circumstances of this case, the "unreasonable force" instruction was unnecessary and unwarranted because the state did not frame its case as one contesting the proportionality of appellant's response to an attack or a perceived threat by Lamarr. Rather, argues appellant, the state's theory of the case, as supported by its own evidence, was that Lamarr did not attack or threaten appellant; thus, the proportionality of appellant's response was not an issue in the case. Appellant further maintains the state never raised the proportionality issue in its opening statement or closing argument.

{¶ 71} In general, a trial court's jury instructions are reviewed for an abuse of discretion. *Hall* at ¶ 34, citing *State v. Dovangpraseuth*, 10th Dist. No. 05AP-88, 2006-Ohio-1533, ¶ 33. Abuse of discretion connotes the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Id.*, citing *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983). "However, whether a particular jury instruction is warranted by the evidence is a question of law." *Id.*, citing *State v. Daniels*, 10th Dist. No. 18AP-626, 2019-Ohio-1791, ¶ 4. "The question of whether a jury instruction is legally correct and factually warranted is

subject to de novo review." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 22.

{¶ 72} In support of his argument, appellant primarily relies on *State v. Guster,* 66 Ohio St.2d 266 (1981), where the Supreme Court stated:

> [A] court's instructions to the jury should be addressed to the actual issues in the case as posited by the evidence and the pleadings. *E.g., State v. Rogers* (1975), 43 Ohio St.2d 28, certiorari denied (1976), 423 U.S. 1061; *State v. Cox* (1975), 42 Ohio St.2d 200, 207); *State v. Linder* (1907), 76 Ohio St. 463. See *United States v. Maselli* (C.A. 6, 1976, 534 F.2d 1197; *Jackson v. United States* (C.A. 6, 1950), 181 F.2d 822. Abstract rules of law or general propositions, even though correct, ought not to be given unless specifically applicable to facts in issue. *E.g., State v. Loudermill* (1965), 2 Ohio St.2d 79; *Scott v. State* (1923), 107 Ohio St. 475, paragraph three of the syllabus. Cf. *Patterson v. United States* (C.A. 6, 1915), 222 F. 599, certiorari denied 238 U.S. 635. These principles govern the giving of instructions on necessary substantive law * * *.

*Guster* at 271. *See also Cromer* at ¶ 22, citing *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, ¶ 26 ("The jury instructions must also be warranted by the evidence presented in a case."). This court has held similarly: " ' "[i]t is well established that the trial court will not instruct the jury where there is no evidence to support an issue." ' " *Hall* at ¶ 35, quoting *State v. Mankin*, 10th Dist. No. 19AP-650, 2020-Ohio-5317, ¶ 34, quoting *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991), citing *Riley v. Cincinnati*, 46 Ohio St.2d 287 (1976).

{¶ 73} In the present case, the state presented evidence, through the testimony of Dr. Daniels, that appellant shot Lamarr four times and that one of those shots struck Lamarr when he was bent over. The state also presented evidence, via Bell's testimony, that Lamarr was unarmed when appellant shot him. Further, the state presented evidence, through appellant's statements to police, that he shot Lamarr because he was tired of being bullied and because Lamarr threatened him and lunged at him and that Lamarr attempted to retreat from the encounter before appellant shot him. In addition, appellant raised the proportionality issue through his own testimony that he shot Lamarr because Lamarr threatened him and lunged at him. As to this evidence, we note that the case law discussing whether the evidence in a case supports a particular jury instruction does not

appear to limit the evidence to that presented by the state. We are also mindful that a trial court " ' "is in the best position to gauge the evidence before the jury and * * * determine whether the evidence adduced at trial was sufficient to require an instruction." ' " *State v. Cameron*, 10th Dist. No. 23AP-635, 2024-Ohio-2427, ¶ 27, quoting *State v. Palmer*, 174 Ohio St.3d 561, 2024-Ohio-539, ¶ 21, quoting *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, ¶ 72.

{¶ 74} We further note that in its closing argument, the state cited appellant's statements to police that he was tired of being bullied and that he shot Lamarr despite being aware that Lamarr was unarmed and was attempting to retreat. The state also cited Dr. Daniels' testimony that Lamarr was shot four times. In addition, in addressing the elements of a self-defense claim, the state noted the element pertaining to "unreasonable force," arguing that "[r]esorting to deadly force is not justified by abusive language, verbal threats, or other words no matter how provocative." (Tr. Vol. 4 at 479.) The state argued that under the circumstances of the case, the use of deadly force was not reasonable.

{¶ 75} We find that the evidence presented in this case, both by the state and appellant, along with the arguments set forth by the state, justified the trial court's "unreasonable force" jury instruction.

{¶ 76} Finally, we note that in his reply brief, appellant raises a new argument—that the court's erroneous "unreasonable force" instruction undermined appellant's substantial right to have the jury render a unanimous verdict as to whether he acted in self-defense. (Appellant's Reply Brief at 16.) Pursuant to App.R. 16(C), an appellant may file a brief "in reply to the brief of the appellee." "The purpose of a reply brief is to afford the appellant an opportunity to respond to the appellee's brief, not to raise an issue for the first time." *Jacobs v. Great Southern Shopping Ctr., L.L.C.*, 10th Dist. No. 23AP-231, 2024-Ohio-1180, ¶ 14, citing *State v. Mitchell*, 10th Dist. No. 10AP-756, 2011-Ohio-3818, ¶ 47. *See also State v. E.T.*, 10th Dist. No. 17AP-828, 2019-Ohio-1204, ¶ 62. Thus, this court generally will not address an argument raised for the first time in a reply brief. *Jacobs* at ¶ 14, citing *State v. Shedwick*, 10th Dist. No. 11AP-709, 2012-Ohio-2270, ¶ 50; *E.T.* at ¶ 62. Even considered, this new argument carries no weight. We first note we have already concluded that the trial court properly instructed the jury on "unreasonable force" as an element of self-defense. Further, "there is no requirement that the jury be unanimous as to which element of self-

defense [it] believed the state disproved." *State v. Huish*, 10th Dist. No. 21AP-255, 2023-Ohio-365, ¶ 50.

{¶ 77} Appellant's second assignment of error is overruled.

## IV. Conclusion

{¶ 78}   Having overruled appellant's two assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, J., concurs.
EDELSTEIN, J., dissents.

EDELSTEIN, J., dissenting.

{¶ 79} I respectfully dissent from the majority's conclusions regarding the jury instructions given in this case, as I would find the self-defense instruction probably misled the jury by misstating Ohio's self-defense law in several respects. Thus, I would sustain Mr. Patterson's second assignment of error, reverse the judgment of the trial court, and remand this matter for a new trial.

{¶ 80} Self-defense is a common-law defense that has not been codified by statute in Ohio. So, unlike in most states, its elements are generally derived from the common law.

{¶ 81} Under Ohio's common law, the elements of a valid self-defense claim have traditionally been stated as follows: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the defendant must not have violated any duty to retreat or avoid the danger. *See State v. Melchior*, 56 Ohio St.2d 15, 20-21 (1978); *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. The Supreme Court of Ohio has held that these elements are cumulative, such that the absence of one precludes the jury from finding the defendant acted in self-defense. *See, e.g.*, *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 73.

{¶ 82} Prior to March 28, 2019, Ohio courts treated self-defense as an affirmative defense, with the defendant bearing the burden of proving all elements of self-defense by a preponderance of the evidence. *State v. Martin*, 21 Ohio St.3d 91, 92-93 (1986) (interpreting R.C. 2901.05), affirmed by *Martin v. Ohio*, 480 U.S. 228 (1987). However, a

defendant no longer bears this burden. *See* R.C. 2901.05(B)(1). Effective March 28, 2019, 2018 Am.Sub.H.B. No. 228 ("House Bill 228") modified R.C. 2901.05, in relevant part, by shifting to the state the burden of proving, beyond a reasonable doubt, that a defendant did not use force in self-defense when the "evidence presented [] tends to support that the accused person used the force in self-defense." *See* R.C. 2901.05. *See also State v. Brooks*, 170 Ohio St.3d 1, 2022-Ohio-2478, ¶ 23 (holding that House Bill 228's burden-shifting amendment to R.C. 2901.05 "applies prospectively to all trials occurring after its effective date, regardless of when the underlying alleged criminal conduct occurred"); *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 19-25 (holding the state's burden of persuasion is not triggered until the defendant produces "legally sufficient evidence" supporting each element of self-defense).

{¶ 83} The Ohio legislature did not, however, statutorily define "self-defense" or otherwise indicate precisely what the state must prove in order to disprove a defendant's self-defense claim beyond a reasonable doubt. In the absence of legislative guidance clearly defining Ohio's self-defense law, it can be difficult for trial courts to craft legally sound and factually appropriate jury instructions regarding the state's burden of disproving a defendant's self-defense claim. Indeed, this is because a range of factual circumstances can—and often do—bear on how each common-law element is understood and applied. When present, these factual circumstances create exceptions, variations, or nuances in the applicability of certain elements. For instance, while it is generally true that an initial aggressor is not entitled to act in self-defense, Ohio's common law restores the right to an initial aggressor who withdraws in good faith from the conflict he created or conveys his intention to withdraw therefrom. *See Melchior*, 56 Ohio St.2d at 20-22. Additionally, an initial aggressor who uses non-deadly force may have the right to use deadly force if the person he attacked responds with deadly force. *See, e.g.*, *State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 28. And, as the majority recognizes, the third element of a common law self-defense claim has since been considerably modified by the General Assembly's amendment to R.C. 2901.09 (effective April 6, 2021)—commonly referred to as the "stand-your-ground" law—in that a person no longer has a duty to retreat from any place they are lawfully entitled to be. *See* 2020 Am.S.B. No. 175. (*See* Majority Decision at ¶ 44.)

{¶ 84} In its current state, Ohio's self-defense law is prime for problems in practice. Ohio statutory law requires trial courts to instruct juries that the state has the burden of disproving a defendant's self-defense claim, but Ohio statutes offer no indication of what this means. Trial courts instruct juries on the common law elements of self-defense and inform the jurors that the state satisfies its burden by disproving, beyond a reasonable doubt, just one of those elements, but Ohio courts' understanding of those elements is not uniform or, worse, may not be entirely consistent with common law, as discussed more below. And, too often, the instruction given to jurors is far more simplistic than the statutory or judge-created nuances or exceptions to a particular element may entail.

{¶ 85} At issue in this case is whether the jurors were accurately, plainly, and unambiguously instructed on the common law elements of self-defense and the state's burden of persuasion in rebutting Mr. Patterson's self-defense claim. For the following reasons, I would find they were not.

{¶ 86} The purpose of jury instructions is to properly guide the jury in deciding questions of fact based on the applicable substantive law. *See, e.g.*, *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, ¶ 5. Although a trial court "has broad discretion to decide how to fashion jury instructions," the trial court must " 'fully and completely' " give the jury all instructions that are " 'relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Jury instructions must therefore "present a correct, pertinent statement of the law that is appropriate to the facts" of the case. *White* at ¶ 46. *See also Marshall v. Gibson*, 19 Ohio St.3d 10, 12 (1985).

{¶ 87} In general, a trial court should give a requested jury instruction if it is a correct statement of the law, is applicable to the facts of the particular case, and reasonable minds might reach the conclusion sought by the instruction. *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 134. Indeed, " 'it is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge.' " *Id.*, quoting *State v. Scott*, 26 Ohio St.3d 92, 101 (1986). There is, however, a limit. "No purpose is served, for instance, by requiring courts to present redundant jury instructions or instructions that are so similar to other

instructions to be presented as to be confusing." *Griffin* at ¶ 5. Thus, a " 'trial court need not give the defendant's requested instructions verbatim but may use its own language to communicate the same legal principles to the jury.' " *Sowell* at ¶ 134, quoting *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 108.

{¶ 88} We review a trial court's refusal to give a requested jury instruction for abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). Whether jury instructions correctly state the law, however, is a legal issue that an appellate court reviews de novo. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 135. " 'In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." ' " *Id.*, quoting *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990). Overall, "[t]he relevant principle for jury instructions is not one of abstract correctness, but is whether an instruction—even if a correct statement of the law—is potentially misleading." *White* at ¶ 52, citing *State v. Guster*, 66 Ohio St.2d 266, 271 (1981) ("Abstract rules of law or general propositions, even though correct, ought not to be given unless specifically applicable to facts in issue.").

{¶ 89} In this case, Mr. Patterson's trial counsel timely requested—both orally and in writing—the trial court instruct the jury on self-defense, in relevant part, as follows:

> Clifford Patterson maintains he used self-defense in all three counts of the indictment.
>
> 1. GENERAL. Clifford Patterson is allowed to use deadly force in self-defense. The state must prove beyond a reasonable doubt that Clifford Patterson, when using deadly force, did not act in self-defense.
>
> 2. STATE'S PROOF. To prove that Clifford Patterson's use of deadly force was not in self-defense, the state must prove beyond a reasonable doubt at least one of the following:
>
> > (A) Clifford Patterson was at fault in creating the situation giving rise to the shooting of Dion Lamarr; or

(B) Clifford Patterson did not have reasonable grounds to believe that he was in imminent danger of serious physical harm or death; or

(C) Clifford Patterson did not have an honest belief, even if mistaken, that he was in imminent danger of serious physical harm or death.

* * *

5. TEST FOR REASONABLE GROUNDS AND HONEST BELIEF. In deciding whether Clifford Patterson had reasonable grounds to believe and an honest belief that he was in fear of imminent serious physical harm or death, you must put yourself in the position of Clifford Patterson, with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surround him at the time.

You must consider the conduct of Dion Lamarr and decide whether his acts and words caused Clifford Patterson to reasonably and honestly believe that he was about to be killed or receive serious physical harm.

(Apr. 20, 2022 Defense Proposed Jury Instructions at 7-8.)

{¶ 90} The trial court rejected the defense's proposed instructions on self-defense and instead instructed the jury, in relevant part, as follows:

The defendant is allowed to use deadly force in self-defense. The State must prove beyond a reasonable doubt that the defendant, when using deadly force, did not act in self-defense.

To prove that the defendant, when using deadly force, did not act in self-defense, the State must prove beyond a reasonable doubt *at least one of the following*:

1. The defendant was at fault in creating the situation giving rise to the death of Dion Lamarr; or

2. The defendant did not have reasonable grounds to believe that he was in imminent or immediate danger of death or great bodily harm;

3. The defendant did not have an honest belief, even if mistaken, that he was in imminent or immediate danger of death of great bodily harm; or

#### 4. *The defendant used unreasonable force*.

\* \* \*

> In deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm, you must put yourself in the position of the defendant, with his characteristics, his knowledge or lack of knowledge, and under the circumstances and conditions that surrounded him at the time. You must consider the conduct of Dion Lamarr and decide whether his acts and words caused the defendant to reasonably and honestly believe that the defendant was about to be killed or received great bodily harm.

> A person is allowed to use force that is reasonably necessary under the circumstances to protect himself from an apparent danger. In deciding whether the force used was greatly disproportionate to the apparent danger, you may consider whether the force used shows revenge or a criminal purpose.

(Emphasis added.)  (Apr. 21, 2022 Jury Instructions at 7-8.)

{¶ 91} In objecting to the trial court's formulation of the jury instructions, Mr. Patterson's trial counsel argued it was improper to include "unreasonable force" as a standalone element "because this was the language that's in [Ohio Jury Instructions ("OJI")], with reference to the changes made to self-defense before stand-your-ground" was enacted, which substantially modified the "duty to retreat" element.  (Tr. Vol. 4 at 460-61, 518.)  Mr. Patterson's trial counsel posited that including the "unreasonable force" language would be "very confusing for the jury" given that Ohio's self-defense law "states you have to look at his belief whether it was reasonable or unreasonable *under the circumstances*." (Emphasis added.)  (Tr. Vol. 4 at 461-62.)  Notwithstanding these concerns and defense counsel's objection, the trial court declined to remove the "unreasonable force" element from the jury instructions, as requested by defense counsel.  (*See* Tr. Vol. 4 at 463-65.) Thus, the jury was instructed, in relevant part, that the state could prove beyond a reasonable doubt that Mr. Patterson, "when using deadly force, did not act in self-defense" by proving, beyond a reasonable doubt, that Mr. Patterson "used unreasonable force." (*See* Apr. 21, 2022 Jury Instructions at 7-8.)  Consistent with Crim.R. 30(A), Mr. Patterson's counsel reiterated the defense's objection to the trial court's decision to include the

"unreasonable force" language multiple times before the jury retired to deliberate. (*See* Tr. Vol. 4 at 465, 470, 530.)

**{¶ 92}** In concluding the trial court did not err in including unreasonable force as a standalone element in the self-defense instruction given to the jury, the majority notes that "the trial court's instruction on self-defense, including the instruction on unreasonable force, is consistent with the instructions set forth in 2 [OJI], Section CR 421.21." (Majority Decision at ¶ 67.) But, I find this point to be largely unavailing.

**{¶ 93}** OJI is not binding legal authority. *See, e.g., State v. Webster*, 10th Dist. No. 20AP-171, 2021-Ohio-3218, ¶ 31; *State v. Smith*, 12th Dist. No. CA2009-02-038, 2010-Ohio-1721, ¶ 14; *State v. Settle*, 11th Dist. No. 2015-T-0119, 2017-Ohio-703, ¶ 24-25. The OJI form instructions "are not officially sanctioned instructions," which means they "have no force or effect as a rule of law." *State v. Mitchell*, 10th Dist. No. 88AP-695, 1989 Ohio App. LEXIS 1632, *7 (May 2, 1989). They are "merely the suggestions of one or more trial or appellate judges [on the Ohio Judicial Conference's OJI committee] as to what those judges feel is an appropriate instruction." *Id*. The OJI form instructions "are promulgated for the guidance of trial judges as a guide, not as a 'bible.' " *Id*. *See also State v. Shaffer*, 11th Dist. No. 2001-T-0036, 2003-Ohio-6701, ¶ 44; *State v. Martens*, 90 Ohio App.3d 338, 343 (3d Dist.1993). A trial court is therefore not required to "slavishly follow form instructions." (Citations omitted.) *State v. Morales*, 6th Dist. No. L-09-1119, 2010-Ohio-3061, ¶ 18. Nor should it.

**{¶ 94}** There are times when a particular standard OJI instruction "may be incomplete or even incorrect for a particular case." *State v. Thomas*, 9th Dist. No. 27266, 2015-Ohio-2935, ¶ 78, citing *State v. Napier*, 105 Ohio App.3d 713, 720-21 (1st Dist.1995). In *State v. Burchfield*, 66 Ohio St.3d 261 (1993), Justice Pfeiffer, writing for a unanimous court, took issue with a particular instruction from OJI by noting that "[w]hile OJI is widely used in this state, its language should not be blindly applied in all cases." *Id*. at 263. *Accord Martens* at 343 ("Requiring a trial court to rigidly follow these instructions would remove judicial * * * flexibility necessary to manage the various situations that arise during a jury trial.").

**{¶ 95}** At issue in this case is whether the trial court's instruction to the jury that a defendant who uses unreasonable force cannot act in self-defense was an accurate

statement of Ohio law. Significantly, neither *Robbins* nor *Melchior*—the seminal cases stating the common law elements of self-defense in Ohio—included any requirement regarding the ***objective reasonableness*** of the ***force*** used. *See, e.g., State v. Palmer*, 174 Ohio St.3d 561, 2024-Ohio-539, ¶ 23 (recognizing the same three elements of a self-defense claim under Ohio common law). In any event, the majority relies on this court's precedent and decisions from other appellate districts to conclude that, "[i]mplict in the second element of self-defense is the requirement that ' "the defendant must have used only that force reasonably necessary to repel the attack. That is, he must not have used excessive force." ' " (Majority Decision at ¶ 43, quoting *State v. Jamii*, 10th Dist. No. 21AP-330, 2023-Ohio-4671, ¶ 77, quoting *State v. Hall*, 10th Dist. No. 21AP-137, 2023-Ohio-837, ¶ 41, citing *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 58.)

{¶ 96} I believe the majority, like the trial court's self-defense instruction to the jury, inaccurately represents the common law elements of self-defense as historically understood in Ohio. Those being, again: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. *See, e.g., State v. Barnes*, 94 Ohio St.3d 21, 24 (2002), citing *Robbins*, 58 Ohio St.2d 74, at paragraph two of the syllabus. The crux of this case is the propriety of the trial court's instruction on the second element.

{¶ 97} The "second element of self-defense is a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). This element considers the "bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties." *State v. Sheets*, 115 Ohio St. 308, 310 (1926).

{¶ 98} To make this assessment, the finder of fact must consider the defendant's situation objectively, that is, whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, he ***reasonably believed*** he was in imminent danger. *Palmer*, 2024-Ohio-539 at ¶ 25, citing *Thomas* at 330. *See also State v. Keith*, 10th Dist. No. 08AP-28, 2008-Ohio-6122, ¶ 23. Then, if the objective standard is met, the jury must determine

if, subjectively, this particular defendant had an ***honest belief*** that he was in imminent danger necessitating the use of deadly force to defend himself. *See Thomas* at 331.

{¶ 99} But, the objective reasonableness of a defendant's ***belief*** regarding the imminence of danger necessitating deadly force is not the same thing as the objective reasonableness of the force actually used. Thus, I believe the majority decision—like the jury instruction given in this case—erroneously confuses the two. The majority's description of the second element—that the defendant must have used only that force reasonably necessary to repel the attack—is akin to the standards under which we evaluate the actions of law enforcement. *See, e.g., State v. White*, 6th Dist. No. L-10-1194, 2013-Ohio-51, ¶ 53-78 (observing that, in a criminal prosecution of a police officer who used deadly force in the line of duty, "the benchmark of the 'objectively reasonable officer' is not just appropriate for criminal prosecutions, but necessary" because such standard "takes into account not only the specialized training and experience of police officers, but also the public-safety role for which they are uniquely employed"). But most citizens do not have the same training on what minimum level of force can be used to repel a deadly attack or the same readily accessible tools as police officers. Under the majority's interpretation of Ohio's common law, however, the state can disprove self-defense by showing that—notwithstanding the objective and subjective beliefs of the defendant supporting the use of deadly force—the force used was ***objectively unreasonable***. Fundamentally, I do not believe this to be an accurate representation of Ohio's common law on self-defense.

{¶ 100} The true question of fact to be ascertained by the second element of self-defense is the bona fide ***belief*** of the defendant as to his imminent peril. "Homicide is justifiable on the ground of self-defense, where the slayer, in the careful and proper use of his faculties, ***bona fide believes***, and has reasonable ground to believe, that he is in imminent danger of death or great bodily harm, and that his only means of escape from such danger will be by taking the life of his assailant, although ***in fact*** he is mistaken as to the existence or imminence of the danger." (Emphasis sic and added.) *Marts v. State*, 26 Ohio St. 162 (1875), paragraph two of the syllabus.

{¶ 101} This means that the conduct of a defendant claiming self-defense must be measured by that defendant's " ' "equipment mentally and physically," ' " not an objectively reasonable person standard. *State v. McLeod*, 82 Ohio App. 155, 158 (9th Dist.1948),

quoting *State v. Cope*, 78 Ohio App. 429, 438 (2d Dist.1946), quoting *Nelson v. State*, 42 Ohio App. 252, 254 (4th Dist.1932). For this reason, Ohio courts have long recognized that a person " ' "may act in self-defense, not only when a reasonable person would so act but when one with the particular qualities that the individual himself has would so do." ' " *Id.* As a result, a nervous, timid, easily frightened individual is not measured by the same standard that a stronger, calmer, and braver person might be. *Id.*, citing *Sheets*, 115 Ohio St. at 309. Indeed, the Ohio Supreme Court has held that, "[i]n charging what any **man of ordinary prudence** might do, or whether the circumstances justified a **reasonably cautious** man in believing in the imminency of the danger, etc., the trial court erred" in instructing the jury on self-defense. (Emphasis sic and added.) *Sheets* at 309-10.

{¶ 102} On review of relevant case law, it appears the proportionality notion the majority finds to be "implicit" in the second element of self-defense actually pertains to the jury's evaluation of the **credibility** of the defendant's bona fide belief. *See, e.g.*, *Hendrickson*, 2009-Ohio-4416 at ¶ 29-33. And, I agree that if a jury finds the force used by a defendant claiming self-defense is so grossly disproportionate to the perceived threat as to suggest revenge or criminal purpose, then such finding would suggest the defendant lacked the bona fide belief the second element requires.

{¶ 103} But, none of the cases cited by the majority stand for the proposition that the state can disprove a defendant's self-defense claim by proving, beyond a reasonable doubt, that the defendant used unreasonable force **without** consideration of what an individual with the same particular qualities and experiences of the defendant would believe and do under the particular circumstances. The majority cites to language in this court's recent decisions in *Jamii*, 2023-Ohio-4671 and *Hall*, 2023-Ohio-837, but neither of those cases directly addressed the propriety of the self-defense instructions given in any way that is relevant to the issue presented in this case. In *Hall*, the defendant contended the trial court erred in refusing to instruct the jury on self-defense; we agreed and sustained that assignment of error. *Id.* at ¶ 45. Because a self-defense instruction was not given, we did not consider whether it would be appropriate to instruct the jury on unreasonable force as a standalone element. In *Jamii* the jury was instructed on self-defense but ultimately rejected it. *Id.* at ¶ 73-74. On appeal, the defendant argued his murder convictions were against the manifest weight of the evidence but failed to "separately address each of the

three prongs of a self-defense claim." *See id.* at ¶ 73, 79. Noting evidence relevant to the first element (initial aggressor) and second element (defendant's bona fide belief) of self-defense—including the defendant's own testimony that neither of the two victims had a weapon, eyewitness testimony describing the incident, and the defendant's actions after the incident—we concluded in *Jamii* that the jury did not lose its way and create a manifest miscarriage of justice in finding the state had proved, beyond a reasonable doubt, that the defendant did not act in self-defense. *See id.* at ¶ 79-85.

{¶ 104} In *Kean*, 2019-Ohio-1171, the defendant attributed error to the trial court's refusal to instruct the jury at his 2017 trial on the rebuttable presumption that the defendant acted in self-defense, not the propriety of instructing the jury in the manner at issue here. *See id.* at ¶ 40-42.

{¶ 105} In lieu of addressing the issue directly, we instead concluded that "any error by the trial court in failing to instruct the jury on the rebuttable presumption of self-defense was harmless beyond a reasonable doubt, as no rational jury could have found appellant's use of a knife under the facts and circumstances of th[e] case was reasonably necessary and proportionate to the danger presented." *Id.* at ¶ 59. As cited in the majority decision, our analysis in *Kean* addressed the second element of self-defense (that the defendant had a bona fide belief he was in imminent danger of death or great bodily harm and his only means of escape was the use of force) by relying on precedent from other appellate districts. *See id.* at ¶ 58. It is from this precedent the majority finds "that implicit in the second element of self-defense is the requirement that a defendant may use only the force necessary to repel an attack and that a defendant's use of deadly force must be warranted under the circumstances and proportionate to the perceived threat." (Majority Decision at ¶ 69, citing *Jamii* at ¶ 77, *Hall* at ¶ 41, *Kean* at ¶ 38, and *Hendrickson,* 2009-Ohio-4416 at ¶ 31.) But, a close examination of that precedent reveals it does not support the formulation of the "unreasonable force" instruction given in this case.

{¶ 106} The issue of proportionality was most succinctly addressed by the Fourth District in *Hendrickson*. In that case, the court generally stated, without reference to any one particular common law element, that "[a] defendant is privileged to use only that force that is reasonably necessary to repel the attack." *Hendrickson* at ¶ 23, citing *State v. Williford*, 49 Ohio St.3d 247, 249 (1990) (stating the same without reference to any

particular common law element of self-defense), citing *McLeod*, 82 Ohio App. at 157. In *McLeod*, the Ninth District concluded it was prejudicial error for the trial court to "refuse to admit and consider the evidence of the threats made the day before" the offense by the victim's younger brother, observing that these threats "[o]bviously * * * had a direct bearing on whether the defendant had a good reason to apprehend danger to himself, as it apparently materialized in [the victim's] visit [to the defendant's home] and attitude." *Id.* at 156-57. After describing the "great disparity between the physical condition" of the victim and the defendant—"the former being 27 years of age, an ex[-]G.I. and in first class physical condition, while the defendant was 63 years of age, and claimed to suffer from arthritis in his hands"—the *McLeod* court observed the following:

> In general, every man has the right to defend himself and his property by the use of such force as circumstances require to protect himself against such danger as he has good reason to apprehend, and the measure of that force depends upon the nature of the assault taken together with all other circumstances, such as the physical disparity between the parties here, and it is only when one uses a greater degree of force than is necessary under all the circumstances that it is not justifiable on the ground of self-defense.
>
> The law does not require of the defendant any nice distinction as to the least amount of force necessary, but whether the force used was excessive is a question for the trier of the facts under proper instruction. Evidence of threats is admissible on the issue of self-defense. * * *
>
> The true question of fact to be ascertained is the bona fide belief of the defendant as to his imminent peril.

(Emphasis omitted.) *McLeod* at 156-57.

{¶ 107} When put in its proper context, then, the holding of *McLeod*—on which *Williford* and *Hendrickson's* statements that "[a] defendant is privileged to use only that force that is reasonably necessary to repel the attack" are based (*see* Majority Decision at ¶ 62-66)—actually ***conflicts*** with the instructions given here. The jury in this case was told that if it found Mr. Patterson used "unreasonable force," the state proved Mr. Patterson did not act in self-defense. The jury was not instructed, however, that its measure of "reasonable force" depends upon the nature of the assault taken together with all other circumstances, such as the physical disparity between the parties. *See, e.g., Hendrickson*

at ¶ 30. Thus, ***even if*** the reasonableness of force is implicit in the second element of self-defense as the majority contends, the instructions given in this case were still legally insufficient because they failed to accurately state Ohio's self-defense law. (*Compare* Majority at ¶ 58-68.)

{¶ 108} Regarding the second element of self-defense specifically, the *Hendrickson* court also opined that, implicit in that element "is the requirement that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." 2009-Ohio-4416 at ¶ 31, citing *State v. Palmer*, 80 Ohio St.3d 543, 564 (1997), and *Cassano*, 2002-Ohio-3751. But I do not read this statement—or the cases *Hendrickson* cites in support—to mean what the overly broad "unreasonable force" instruction given to the jury in this case ultimately said: that a defendant does not act in self-defense if he uses "unreasonable force" without consideration of the surrounding circumstances.

{¶ 109} For instance, in *Cassano*, the Supreme Court found that the trial court's erroneous instruction on the "duty to retreat" element was harmless because the defendant had no basis for a "bona fide belief that he was in imminent danger of death or great bodily harm" and could "escape from such danger" only by using deadly force. *Id.* at ¶ 74-76. The defendant claimed the victim had brandished a "shank," but admitted to retrieving the weapon before repeatedly stabbing the victim with it even after he no longer posed any conceivable threat to the defendant. *Id.* at ¶ 76-77. The defendant continued the attack even after the corrections officers were at the cell door and ordered him to stop. *Id.* at ¶ 77. Thus, the court found the defendant was not prejudiced by the trial court judge's erroneous instruction on the duty to retreat because no reasonable jury could have believed he acted in self-defense under those circumstances. *Id.*, citing *Palmer*, 80 Ohio St.3d at 564. And, in *Palmer*, the court found the trial court properly refused to instruct the jury on self-defense because, given the evidence that the defendant fired two shots into the head of an unarmed victim, no reasonable jury could have believed the defendant used deadly force in "good faith." *Palmer* at 564.

{¶ 110} It is worth noting that although the *Hendrickson* court concluded that, based on evidence of the defendant's continued use of deadly force after disarming the victim—including the defendant's 2 minor stab wounds contrasted with the severity and location of the victim's 14 stab wounds and other defensive injuries—the defendant in that

case was not entitled to an instruction on self-defense, it nonetheless emphasized the necessary limit to its proportionality analysis:

> We are quick to acknowledge that the law does not require one who is exercising self-defense in response to a deadly threat to measure his efforts with the eye of a surgeon. The exigency of that situation does not require analytical precision. To paraphrase Justice Holmes in *Brown v. United States* (1921), 256 U.S. 335, 41 S. Ct. 501, 65 L. Ed. 961, ***detached reflection in the presence of deadly force is an unreasonable demand***. However, we do not impose such an unreasonable standard here.

(Emphasis added.) *Hendrickson*, 2009-Ohio-4416 at ¶ 37.

{¶ 111} Yet, the majority relies on *Hendrickson* and other cases citing *Hendrickson* to conclude that the trial court did not err in instructing the jury on precisely the type of "unreasonable demand" renounced by the *Hendrickson* court: that the jury could find Mr. Patterson did not act in self-defense if the state proves, beyond a reasonable doubt, that Mr. Patterson used unreasonable force ***without regard to relevant circumstances*** other than the appearance of a vengeful or criminal purpose.

{¶ 112} As formulated in this case, I believe the self-defense instruction given to the jury was akin to the self-defense instruction disavowed in *Sheets* (charging what any man of "*ordinary prudence*" might do, or whether the circumstances justified a "*reasonably cautious*" man in believing in the imminency of the danger). (Emphasis sic.) *See Sheets*, 115 Ohio St. at 309. And, inclusion of "unreasonable force" as either a separate element of self-defense or a necessary subcomponent of the second element is not supported by recent Supreme Court precedent interpreting Ohio's self-defense law. *See, e.g.*, *Palmer*, 2024-Ohio-539 at ¶ 25-30; *Messenger*, 2022-Ohio-4562 at ¶ 14.

{¶ 113} In addition to the erroneous inclusion of "unreasonable force" as a standalone item the state could prove, beyond a reasonable doubt, in order to disprove Mr. Patterson's self-defense claim, other paragraphs of the trial court's self-defense instruction further ensured an incorrect application of the law. The jury was instructed that, "[i]n deciding whether the defendant had reasonable grounds to believe and an honest belief that he was in imminent or immediate danger of death or great bodily harm"—which relate to the second and third elements the jury was instructed on (*see* Jury Instructions at 7-8)— "you must put yourself in the position of the defendant, with his characteristics, his

knowledge or lack of knowledge, and under the circumstances and condition that surrounded him at the time." (Jury Instructions at 8.) However, the jurors were not explicitly instructed to put themselves in the shoes of the defendant when deciding whether the state proved Mr. Patterson "used unreasonable force," which was itemized as the fourth element in the trial court's self-defense instruction. (*See* Jury Instructions at 8.) Moreover, because the jury was only instructed to consider the surrounding circumstances when analyzing just two of the four self-defense elements delineated by the trial court, such formulation necessarily would suggest that the surrounding circumstances had no relevance to the jury's determination of whether Mr. Patterson's use of deadly force was unreasonable. But this is not an accurate representation of Ohio's self-defense law.

{¶ 114} True, the trial court included a proportionality instruction indicating that "[a] person is allowed to use force that is reasonably necessary under the circumstances to protect himself from an apparent danger." (Jury Instructions at 8.) However, that instruction was too narrowly formulated to accurately describe the relevant law. The trial court's statements to counsel outside of the presence of the jury indicated the court intended this instruction to describe "what is unreasonable force." (Tr. Vol. 4 at 464.) Yet, the jury was only instructed that "[i]n deciding whether the force used was greatly disproportionate to the apparent danger, you may consider whether the force used shows revenge or a criminal purpose." (Jury Instructions at 8.) The jury was not told, however, to consider whether the deadly force used in this case would be reasonable in the eyes of a person with Mr. Patterson's particular qualities, experience, and knowledge. It is my opinion that this failure resulted in the jury being inaccurately instructed on the applicable law.[5]

---

[5] Given the confusion surrounding jury instructions on self-defense in criminal trials, it might be prudent for Ohio's General Assembly to consider enacting, as almost all other states have done, a comprehensive statutory framework regarding the use of deadly and non-deadly force as an affirmative defense in a criminal prosecution. *See, e.g.*, Ala. Code § 13A-3-23; Alaska Stat. §§ 11.81.330 through 11.81.430; Ariz. Rev. Stat. Ann. §§ 13-403 through 13-411; Ark. Code Ann. §§ 5-2-605 through 5-2-620; Cal. Penal Code §§ 195 through 199; Colo. Rev. Stat. §§ 18-1-703 through 18-1-707; Conn. Gen. Stat. Ann. §§ 53a-18 through 53a-23; Del. Code. Ann. tit. 11, §§ 464 through 471; Fla. Stat. §§ 776.012 through 776.07; Ga. Code Ann. §§ 16-3-21 through 16-3-24; Hawaii Rev. Stat. §§ 703-304 through 703-310; Idaho Code §§ 18-4009 and 19-202A; 720 Ill. Comp. Stat. 5/7-1 through 5/7-9; Ind. Code §§ 35-41-3-2 and 35-41-3-3; Iowa Code §§ 704.1 through 704.13; Kan. Stat. Ann. §§ 21-5220 through 21-5231; Ky. Rev. Stat. Ann. §§ 503.050 through 503.120; La. Rev. Stat. Ann. §§ 14:19 through 14:22; Me. Rev. Stat. tit. 17, §§ 101 through 108; Mich. Comp. Laws §§ 780.961 through 780.974; Minn. Stat. §§ 609.06 through 609.066; Miss. Code Ann. § 97-3-15; Mo. Rev. Stat. §§ 563.031 through 563.061; Mont. Code Ann. §§ 45-3-101 through 45-3-116; Neb. Rev. Stat. §§ 28-1409 through 28-1414; Nev.

{¶ 115} Mr. Patterson preserved the claimed error regarding the propriety of the jury instruction on the second element of a self-defense claim in the trial court. (*See* Tr. Vol. 4 at 459-65, 518.) And, in his second assignment of error, Mr. Patterson argues the trial court erred in instructing the jury that the state "may carry its burden of demonstrating Appellant did not act in self-defense if it proved beyond a reasonable doubt he exercised unreasonable force while doing so." (Appellant's Brief at 52.) Thus, the harmless-error standard of Crim.R. 52(A) applies. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 15. That rule states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." An affirmatively erroneous portion of a jury charge does not constitute reversible error under Crim.R. 52(A) unless the defendant has been prejudiced by the erroneous instruction. *See* R.C. 2945.83(D); Crim.R. 33(E)(4); *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph two of the syllabus. " 'In examining errors in a jury instruction, a reviewing court must consider the jury charge ***as a whole*** and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." ' " (Emphasis added.) *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 115, quoting *Kokitka*, 73 Ohio St.3d at 93, quoting *Becker*, 53 Ohio St.3d at 208.

{¶ 116} Based on the foregoing and in light of the controlling standard of review, I would find the jury instructions in this case were misleading and probably misled the jury, "because without a proper instruction on the use of deadly force and [self-defense], the court failed to give the jury the instructions necessary to weigh the evidence and discharge its duty as fact-finder." *White*, 2015-Ohio-492 at ¶ 53, citing *Rasanen v. Doe*, 723 F.3d 325, 337 (2d Cir.2013) (holding the trial court erred in failing to instruct the jury that deadly force is justifiable when an officer reasonably believes the suspect poses a significant threat of death or serious physical injury); *Rahn v. Hawkins*, 464 F.3d 813, 818 (8th Cir.2006)

Rev. Stat. §§ 200.120 through 200.200, 200.275; N.H. Rev. Stat. Ann. §§ 627:3 through 627:9; N.J. Rev. Stat. §§ 2C:3-4 through 2C:3-11; N.M. Stat. Ann. §§ 30-2-7 through 30-2-8; N.Y. Penal Law §§ 35.10 through 35.30; N.C. Gen. Stat. §§ 14-51.2 and 14-51.3; N.D. Cent. Code §§ 12.1-05-03 through 12.1-05-07.1, 12.1-05-12; Okla. Stat. tit. 21, §§ 643, 731-733, 1289.25; Or. Rev. Stat. §§ 161.205 through 161.267; 18 Pa. Cons. Stat. §§ 505 through 509; R.I. Gen. Laws § 11-8-8; S.C. Code Ann. §§ 16-11-420 through 16-11-450; S.D. Codified Laws §§ 22-18-4 through 22-18-6; Tenn. Code Ann. §§ 39-11-611 through 39-11-622; Tex. Penal Code Ann. §§ 9.31 through 9.34; Utah Code §§ 76-2-402 through 76-2-409; Vt. Stat. Ann. tit. 13, §§ 2305 and 1024(d); Wash. Rev. Code §§ 9A.16.020 through 9A.16.050; Wis. Stat. §§ 939.48 and 939.49; Wyo. Stat. Ann. §§ 6-2-601 and 6-2-602.

("The sole issue at trial was whether the defendants' use of force was justified. A correct statement of the law as to what circumstances justified deadly force was therefore critical to a correct disposition of the case."); *Haislah v. Walton*, 676 F.2d 208, 213 (6th Cir.1982) (holding jury charge was improper because it "repeatedly referr[ed] to force 'necessary under the circumstances' without saying what the force was necessary for").

{¶ 117} On the whole, I do not believe the self-defense jury instructions given in this case were sufficiently clear to enable the jury to understand the state's burden of proof on the second element of self-defense, as stated under Ohio common law. The second element is particularly complex, in that it encompasses multiple components. As recently stated by the Supreme Court, the second element requires the jury to determine whether "the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force." *Messenger*, 2022-Ohio-4562 at ¶ 14, quoting *Barnes*, 94 Ohio St.3d at 24. Put another way—and read in conjunction with R.C. 2901.09—the second element requires that a person's subjectively honest belief that he was in imminent danger of death or great bodily harm, even if mistaken, be objectively reasonable under the circumstances and that the force used reasonably appeared to be "necessary to prevent injury, loss, or risk to life or safety" given the circumstances known to him at the time. *See, e.g.*, *Thomas*, 77 Ohio St.3d at 329-31; R.C. 2901.09.

{¶ 118} As such, and even disregarding the improper "unreasonable force" instruction, I believe the jury was still inaccurately instructed on the second element of self-defense, to the prejudice of Mr. Patterson. Given the intricacies of this element, I believe it is no longer possible—or at least, prudent—to splice components of the second element in describing the state's burden of disproving self-defense to the jury, as the trial court did in this case. It is difficult to simplify the second element of self-defense in such a manner because the components embedded in it are so inextricably intertwined that attempting to isolate and describe each component individually is prime for the error presented here. Essentially, the second element requires jurors to look at all relevant circumstances, put themselves in the shoes of the defendant, and consider whether it was reasonable for this particular defendant to believe—***even if mistaken***—he was facing an imminent risk of

death or great bodily harm and, if so, for him to believe deadly force was necessary to avoid it.

{¶ 119} On review, I believe the self-defense jury instructions in this case were legally inaccurate, not just because they stated, without adequate qualification, that a defendant who uses "unreasonable force" does not act in self-defense. But, because of this deficiency, the trial court also failed to properly instruct the jury on the proportionality component that is tied to its subjective and objective analysis of Mr. Patterson's belief regarding the imminence of harm. Surely, the more reasonable a defendant's subjective belief that he was in imminent danger of death, the more reasonable it is to believe deadly force was necessary.

{¶ 120} Given the erroneous formulation of the self-defense instruction provided in this case, I would find it is not possible to ascertain what the jury's verdict would have been had the proper self-defense instructions been given. Indeed, regarding the first element, the majority concludes that, given the state's evidence, "the jury could have reasonably concluded that [Mr. Patterson] was at least partially at fault for creating the situation giving rise to the shooting of [Mr.] Lamarr." (Majority Decision at ¶ 49.) But this is not a case where the facts and evidence clearly establish the defendant was the initial aggressor, generally precluding any claim he acted in self-defense. *Compare State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 30, 38 (finding "the video evidence [of the encounter resulting in a shooting death] was clear that [the defendant] was the initial aggressor in the affray" because it "demonstrate[d] that [the defendant] confronted [the victim] aggressively in the street with the intention of physically fighting with him."). Thus, in considering the self-defense jury instruction in its entirety, I cannot conclude the trial court's erroneous charge amounted to harmless error under Crim.R. 52(A). *See, e.g., Wilks*, 2018-Ohio-1562 at ¶ 115.

{¶ 121} For these reasons, I would find the trial court's instruction on self-defense in this case "probably misled the jury" on Ohio's self-defense law (*see Dean*, 2015-Ohio-4347 at ¶ 135), to the prejudice of Mr. Patterson's substantial rights, and, thus, constituted reversible error. *See, e.g., State v. Jalowiec*, 91 Ohio St.3d 220, 231 (2001), quoting *State v. Price*, 60 Ohio St.2d 136 (1979), paragraph four of the syllabus. Accordingly, I would

sustain Mr. Patterson's second assignment of error and remand this matter to the trial court for a new trial.

_____